Filed 8/15/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S048763 |
| v. | ) | |
| | ) | |
| SERGIO DUJUAN NELSON, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. KA019560 |
| _____ | ) | |

Defendant Sergio Dujuan Nelson was convicted of the first degree murders of Robin Shirley and Lee Thompson. (Pen. Code, § 187; all undesignated statutory references are to this code.) The jury also found true the special circumstance allegations that Nelson committed multiple murders and that the murders were committed while lying in wait. (§ 190.2, subds. (a)(3), (a)(15).) It also found true firearm-use allegations. (Former § 12022.5, subd. (a).) The first jury was unable to reach a penalty verdict, and the trial court declared a mistrial. At the second penalty phase, the jury returned a verdict of death. The trial court denied Nelson's motions for a new trial (§ 1181) and for modification of the penalty verdict (§ 190.4, subd. (e)), and entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We reverse the judgment on the lying-in-wait special circumstance due to insufficiency of the

~ SEE CONCURRING AND DISSENTING OPINION ~

evidence.  We also reverse the penalty phase judgment due to the trial court's unwarranted intrusion into the jury's deliberative process and remand for retrial of the penalty phase.  We otherwise affirm the judgment.

## I.  FACTS

**A.      Guilt Phase**

### 1.  Overview

On September 11, 1993, Nelson resigned from his job at Target after failing to receive a promotion.  Shortly before 4:00 a.m. on October 2, 1993 he shot and killed Robin Shirley, the woman who received the promotion Nelson believed he had deserved, and Lee Thompson, a coworker who had defended Shirley when Nelson harassed her about her promotion.  Nelson knew Shirley typically waited in the parking lot for the store to open.  He rode to the Target parking lot on his bicycle, armed with a loaded gun.  Shirley and Thompson were in the front seat of Thompson's car.  Nelson parked his bicycle, approached the car on foot from behind and fired several shots into the car through an open rear window, then started to walk away before returning and firing additional shots into the car.  After shooting Shirley and Thompson, Nelson fled the scene on his bicycle, which he then abandoned when police chased him.  In his closing argument, Nelson's attorney conceded Nelson had killed the victims but argued the shootings had not been deliberate and premeditated.

### 2.  Prosecution Case

On May, 2, 1992, Nelson, then 17, was hired at the La Verne Target store on Foothill Boulevard near White Avenue as a member of the "push team" that unloaded trucks and stocked shelves.  Alejandro Sandoval, the push team leader, testified Nelson was an excellent worker who took on additional responsibilities and occasionally filled in for Sandoval.  Still, both Sandoval and his supervisor,

2

Kristin Strickland, told Nelson he needed to improve his interpersonal skills, because Nelson was demanding of coworkers and inappropriately acted like a supervisor even when he was not in charge. Nelson seemed receptive to the advice and continued to work hard.

In the spring of 1993, Nelson's ex-girlfriend, Karen Horner, was hired at the Target store and joined the push team. (All undesignated calendar references are to 1993.) Nelson and Horner, a woman in her late 30's, had become romantically involved while Nelson was 16 and still in high school and had lived together from November 1991 until late 1992. After their relationship ended, Nelson and Horner remained friends. According to Horner, they continued to socialize and occasionally were intimate.

In June 1993 Sandoval was promoted and his position as push team leader became available. Both Nelson and Robin Shirley, a fellow push team member, applied for the job. Shirley and Nelson were "good friends at work," and she occasionally gave him rides to work. Horner, who was jealous of Shirley, believed "something was going on" between Nelson and Shirley because they often socialized at work and Nelson had been to Shirley's home. Nelson told Horner that he wanted the promotion. Sandoval told Nelson he believed Nelson would be promoted. Nelson bragged to his coworkers that he was going to get the job and told other team members not to bother applying.

The day before the official announcement, Strickland told Nelson he would not be promoted. Nelson was upset that "people might make fun of him" and wanted to quit. Strickland encouraged him to stay, suggesting that he could be promoted in the future, but Nelson submitted a form indicating his intention to resign effective that day. Later that day he told Strickland he had changed his mind.

The next morning, Strickland announced over the loudspeaker that Shirley had received the promotion. Some members of the push team taunted Nelson over Shirley's promotion. After Shirley was promoted, Nelson would have nothing to do with her. His job performance declined; he kept to himself and was noticeably depressed. Horner told Nelson he should have received the promotion because he was "quicker" than Shirley and because Sandoval "pumped [him] up for it." Soon after Shirley was promoted, Nelson told Sandoval that he was "mad" because he felt he had deserved the promotion and burst into tears.

In late August, Lee Thompson and his friend, Robert Comeau, began working at the Target store. Comeau testified that he, Thompson, and Shirley often spent time together during lunch and breaks. According to many of her coworkers, Shirley regularly arrived at work early and parked her truck in front of the Target store. Those workers testified that employees often gathered in the parking lot and sat together in their cars before work. They noted that it was not uncommon for Shirley and Thompson to be seated in one or the other's car before work. Comeau agreed that it was not uncommon for Thompson and Shirley to sit in a car together before the store opened, talking or listening to music, but he added that "[s]ometimes it was me and Robin or me and Lee or some other people."

Soon after he started working at Target, Comeau was in the stockroom with Shirley and Thompson when Nelson joined them and angrily told Shirley that he deserved the promotion, not her. Thompson accused Nelson of harassing Shirley and told him to leave. Nelson left when Comeau approached him.

A few days later, Comeau heard a work radio "flick on and off" and then heard Thompson and someone else talking. Thompson sounded upset; it seemed like there was going to be a fight. Comeau approached and saw

4

Thompson and Nelson a couple of feet apart facing each other. Comeau told Thompson not to fight and pushed him away from Nelson. Nelson told Thompson, "I will get you, I will get you back some day."

The next day, September 11, Nelson received a warning notice from Strickland due to his disruptive comments about Shirley. Nelson signed the warning, but then resigned effective that day.

At approximately 3:40 a.m. on October 2, witness Richard Hart and an acquaintance were outside of a 7-Eleven store near the Target when Hart heard a sound similar to repeated gunfire coming from the front of the Target store. He looked toward Target and saw a "muzzle flash" where a man was standing next to a truck and a car; the truck belonged to Shirley and the car, a Plymouth, to Thompson's mother. Hart later identified the man as Nelson in a lineup and at trial. Nelson was clad in black clothing and wearing a black baseball cap. He appeared to be firing a gun into the Plymouth, but then stopped, turned around, and walked away. Hart heard a "gurgling" or "a rumbling" from the vicinity of the two vehicles. Nelson walked back to the car and fired two or three more rounds into it. Before Hart lost sight of him, Nelson appeared to adjust his pants or put something in them. Hart called 911.

La Verne Police Officer Larry Ross, the first responder, saw two people, Shirley and Thompson, in the Plymouth. He also observed the car's doors were closed, its front windows were up, and its rear windows were rolled about halfway down. The radio was on. The car keys were in the ignition, but the engine was off. Ross checked Shirley and Thompson for vital signs and concluded they were dead.

Shirley was seated in the front passenger seat with a bullet wound to her forehead. Her head was tilted slightly to the left, and she was slumped towards the

center of the seat.  Before Ross could photograph her position, her body slumped "down further and further."  She was fully clothed with her shoes and socks on.  Her arms were bent and facing inward and her hands were closed and on her lap.  Thompson was in the driver's seat, which was somewhat reclined, and he was slumped over.  His bloodied head rested on the right floorboard.  Thompson was also fully clothed except for his shoes, which were on the floor beneath the steering wheel.

Sergeant Carlton Williams was in his patrol car when he heard over the police radio that a thin black or Hispanic man wearing dark clothing who may have been involved in the Target shooting was heading toward White Avenue.  He saw a male wearing dark clothing heading south on White Avenue on a bicycle and illuminated him with a spotlight.  The bicyclist's physique was consistent with Nelson's.  The bicyclist abruptly made a U–turn and quickly rode north.  Williams pursued him until he abandoned the bicycle, ran across a dirt field, and disappeared into a commercial complex.  Williams confiscated the bicycle.  Williams testified that there were trees and brush near the Target store where someone could hide a bicycle.

When Horner arrived for work on October 2, she saw yellow tape surrounding Shirley's truck and Thompson's mother's car and heard a rumor that two people had been killed.  Horner left work.  She, Nelson's cousin, Alex Cosey, and Nelson's friend, Johnny Lopez, drove around looking for Nelson.  Lopez used a pay telephone to call Nelson's pager.  As they waited for Nelson to return the page, he appeared across the street from them wearing a dark baseball cap and black clothing.  Horner asked where he had been, but Nelson did not answer.  When Horner said that there were two dead people at Target, Nelson responded, "Who?  Robin and Lee?"

Lopez drove Horner and Nelson toward the house in Pomona where Nelson lived. Horner asked Nelson where his gun was. He pulled down his waistband and showed it to her. Nelson had Lopez drop him off near the railroad tracks behind his house. Nelson got out of the car wearing a black holster and carrying the gun.

Police later searched the area by the railroad tracks near where Lopez dropped Nelson off. They found a black holster concealed in bushes by the tracks and a Taurus nine-millimeter semiautomatic handgun buried beneath a cinder block. The gun had a live round in the chamber and six live rounds in the magazine. In postarrest interviews, Nelson admitted he owned the holster and the gun. During an October 5 interview, he claimed that he had thrown the empty gun in a dumpster about a week earlier because Pomona police officers told him that he could be charged with second degree murder if the gun ended up in the wrong hands. When asked for details about that incident, Nelson declined to discuss it further.

Seven expended casings and two bullets were recovered at the murder scene. Five were on or under the Plymouth's back seat. Firearms examiner Dwight Vanhorn testified that the expended cartridge cases from the scene and the expended bullets recovered from the bodies came from Nelson's gun.

Senior medical examiner James Ribe testified that Shirley and Thompson died from multiple gunshot wounds. The first two shots that struck Shirley were concurrent causes of death. One bullet entered her middle forehead and the second one the back left side of her neck. A third, nonfatal, bullet entered her left shoulder. The first bullet had been fired from no more than 24 inches away. Thompson suffered a wound to his left temple and four wounds to his left back and side. The trajectory of the four bullets was consistent with Thompson having

7

been leaning forward as the wounds were inflicted. Except for a gunshot to his shoulder blade, all of Thompson's wounds were fatal. Senior criminalist Elizabeth Devine testified that the first round fired caused the wounds to Shirley's neck and that the second round fired caused the wound to Thompson's temple.

Lieutenant Carl Brubaker testified that his officers interviewed Target employees and Nelson's family and friends in an attempt to discover if this case involved jealousy or a lover's triangle. Those officers did not uncover evidence of a romantic relationship between Nelson and Shirley or a lover's triangle between Nelson, Shirley, and Thompson. His officers only learned that there was friction between Nelson and Shirley and between Nelson and Thompson.

On October 2, officers executed a search warrant at Nelson's house in Pomona. They recovered a pager from Nelson's room and then placed Nelson under arrest for murder. At the police station, he waived his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rights and was interviewed. Nelson said that when Shirley received the promotion he was not angry but did not feel "capable of performing the way [he] used to." He denied knowing Shirley had been murdered but said he had heard from his aunt that two non-Target employees had been killed and dumped at Target. When he realized that he was suspected of the murders, Nelson said, "I didn't do it. I wasn't there." He claimed that on the morning of the shooting he was at or near home, except for when he and his cousin Alex Cosey went running, between 7:00 a.m. and 7:30 a.m. Nelson said that two days earlier he had ridden Cosey's bicycle to a mall where it had been stolen. Nelson added that he recently painted that bicycle black. He claimed he had not seen or spoken to Horner the day of the shooting. In a second interview two days later, Nelson repeated the claimed time sequence for the day of the murders. He said that on the day of the shooting another cousin, Phillip Davis, gave him a ride home

from football practice. He identified the confiscated bicycle as the one stolen from him two days before the murders.

During this interview, Nelson said he did not know Lee Thompson because he had just started working at Target when Nelson quit. Nelson said he "couldn't work there mentally" because Strickland accused him of "bad mouthing the other employees." He claimed he stopped socializing with employees two weeks before Shirley was promoted because the workers were "saying a bunch of lies." Nelson denied having bragged he would get promoted, but admitted he knew that Strickland had said his bragging was one reason he was not promoted. He said that, before the promotion, he and Shirley were "friends." He said that it had been "normal" for him, Sandoval, and Shirley to arrive at the Target store early and wait for Strickland to open the store. Nelson knew that Shirley owned two trucks and that she drove both to work. Nelson denied ever getting mad at or threatening Shirley or telling anyone that he should have received the promotion. Nelson said he did not know what kind of car Thompson drove.

Nelson said he had only used the repainted bicycle for two days before it was stolen. He admitted having bought a black holster and a nine-millimeter gun from Cosey but said he never bought bullets for the gun or shot it and had thrown it in the trash the day after he quit Target.

### 3. Defense Case

At trial, the defense conceded that Nelson shot and killed the victims but attempted to establish it was a spontaneous act committed without premeditation or deliberation. To that end, the defense presented testimony that Nelson suffered from various mental health problems, including depression so severe he had made at least one suicide attempt and had repeatedly made suicide threats. The defense also presented evidence to show Nelson's fragile mental state was worsened by his

9

mother's rejection of him in favor of her boyfriend and a complicated relationship with Karen Horner and her daughter, Valerie — Nelson was in love with Valerie, but sexually involved with Karen. The defense also presented evidence that Robin Shirley had flirted with male employees at Target, but presented no evidence of a romantic relationship between her and Nelson. Essentially, the defense attempted to show that Nelson's mental health problems, family dysfunction, and sexual and relationship issues combined with his failure to win a coveted promotion led him to snap and kill the victims impulsively.

Valerie Horner (Valerie) testified she first met Nelson in 1991 through her brother Allen with whom Nelson was friends. (Here and elsewhere, individuals with the same surname are referred to by their first names to avoid confusion.) Nelson was often at the Horners' house that summer because he was not getting along with his mother's boyfriend and his mother did not pay attention to him. Nelson told Valerie he loved her but she told him that she wanted to "just remain friends." Sometime in August 1991, Karen became angry because Valerie, Nelson, and Valerie's cousins were in Valerie's bedroom with the door closed. Karen sent Valerie to stay with relatives until school started. That fall, Nelson began skipping classes and then dropped out of school. He told Valerie that he was seeing an older woman who, Valerie learned, was her mother. Nelson told Valerie if he could not have her, he "went for second best."

Nelson called Valerie in February 1992, sounding very depressed. He picked her up the next day and drove to the trailer park in San Bernardino where he lived with Karen, who was not at home. Nelson appeared very thin and said he saw no reason to live. Valerie testified that Nelson often spoke that way. While they were in the trailer, Valerie had sex with Nelson because she "cared" for him

10

and because she wanted to "get back" at her mother. In April 1992, Nelson and Valerie stopped speaking.

Yvonne Cosey, Nelson's aunt, testified that Nelson was depressed and became anorexic after his mother kicked him out of her home in 1991. Nelson had been living with Karen, but moved into Yvonne's house in Pomona in June of 1993. Karen frequently visited and called Nelson at Cosey's house. Alex Cosey, Yvonne's son, testified he was aware of Nelson's problems at the Target store, but felt Nelson had appeared "normal" in the months before the shooting. Yvonne testified that in September, Nelson became quiet and withdrawn. She was unaware he had quit his job. She thought that his personality had changed because she had been laid off in September and had asked him to contribute financially to the household.

Alex also testified that he gave Nelson the nine-millimeter gun in June 1993, after his family was threatened by a gang that controlled their neighborhood. Another cousin, Phillip Davis, testified that he and Nelson had armed themselves after a gang member pointed a gun at Davis that June. Alex testified Nelson kept the gun beneath his pillow and that he had last seen Nelson with it a couple of weeks before the murders during an altercation with the gang. Cosey also testified that Nelson almost always wore dark clothing, a detail confirmed by Johnny Lopez.

Johnny Lopez testified that he visited Nelson and Karen in San Bernardino while they lived together and described them as constantly arguing. In February 1992, Nelson started giving away his belongings as part of his decision to kill himself. Lopez believed Nelson's problems were caused in part by his relationship with Karen. Once Karen was "out of the scene," Lopez and Nelson spent more time together and Lopez felt that Nelson seemed "back to normal."

11

Michelle Horner was married to Allen Horner, Karen Horner's son. Michelle testified that Karen and Nelson lived with her and her husband in the fall of 1992. Nelson "constantly" talked about committing suicide, often while holding a knife. Michelle and Allen spent hours telling Nelson not to kill himself; afterwards, Nelson would go to bed "like it was nothing." Michelle did not consider the threats to be serious. She thought Nelson simply wanted attention. After Nelson and Karen moved to a trailer in San Bernardino, Nelson prevented Michelle and Allen from talking to or seeing Karen. Michelle felt that Nelson controlled Karen through most of the relationship. She had also seen bruises on Karen's hands. Karen moved back in with Michelle and Allen in March 1993. Between the time Nelson quit his job at Target and the shooting, Karen called him daily. During the conversations, Karen accused Nelson of flirting with his coworkers, called Shirley a "whore" and a "bitch," and told Nelson that he should have received the promotion.

Michelle testified that that she, Allen, Karen, her sister and Nelson spent 12 hours together at the Los Angeles County Fair two days before the shooting. Nelson had seemed to her "to be the same person" he had always been.

On March 29, 1992, Nelson was treated at a Kaiser Permanente hospital emergency room for an overdose of Robaxin, a muscle relaxant. Dr. Robert Frost, the treating physician, testified that Nelson reported having consumed about 10 tablets when the usual dosage was one tablet. Dr. Frost could not determine if Nelson actually had taken Robaxin because blood work did not reveal drugs in Nelson's system. Nelson's stomach was pumped and he was referred for a psychological consultation.

Psychologist Herb Glazeroff conducted that consultation. Nelson told Dr. Glazeroff he tried to commit suicide because he felt he was a burden to others but

12

did not mention any prior suicide attempts. Dr. Glazeroff diagnosed Nelson with an "adjustment disorder with depressed mood" and referred him to a local clinic. Dr. Glazeroff concluded Nelson's action was not "a serious suicide attempt" because it appeared that Nelson had acted impulsively, had reported his conduct, and had come to the hospital voluntarily. Dr. Glazeroff concluded that Nelson presented "no psychotic indicators" and that his cognitive function was intact. He discharged Nelson after determining that he was not "at risk to harm himself."

Several witnesses who had worked at Target at the same time as Nelson, Shirley, and Thompson also testified. Two of them — Tracy Robinson and Elizabeth Rylander — testified that, while Shirley and Nelson were friends at work, and Nelson had made physical advances to Shirley, she had no romantic interest in him. They stopped associating at work after Shirley was promoted. Robinson also testified that Shirley, who was married but had been separated, was "flirty" with other male employees, including Thompson whom she thought was "very cute." Raymond Nieto and Charles McGruder, father of Justin McGurder, also a Target employee, testified that Shirley had pursued Nieto and Justin when the two men worked at Target, but neither was interested. However, Frances Voss, another Target employee, testified she had never seen evidence Shirley was intimate with any of her coworkers.

Robinson also testified that Nelson had irked Thompson by telling him how to do his job. Robinson, Voss, and Nieto testified that Nelson was devastated when he was not promoted and fell into a depression.

Dr. Stephen Wells, a forensic psychologist, met with Nelson five times in the summer of 1994 for a total of 10.5 hours. Besides interviewing Nelson, Dr. Wells also interviewed his mother, reviewed police reports, and read Nelson's medical and high school records. Additionally, Dr. Wells administered three

standardized tests to Nelson: (1) the Million Clinical Multi–Axial (MCMI); (2) the Minnesota Multi-Phasic Personality Inventory (MMPI); and (3) the California Psychological Inventory. Dr. Wells testified that the test results supported a diagnosis of paranoid schizophrenia and dysthymia, a type of long-standing depression. He explained that these disorders can cause a person to experience disordered thinking, act on delusional ideas, misinterpret social situations, and have difficulty handling anxiety and recognizing alternatives during a conflict.

Dr. Wells characterized Nelson's relationships with Karen Horner and her daughter Valerie as "pathological," in part because Nelson loved Valerie and not her mother, yet he was intimate with Karen. Regarding Nelson's relationship with Shirley, Nelson told Dr. Wells it had been friendly, but "not . . . intimate or romantic."

Regarding the shooting, Nelson told Dr. Wells he remembered having trouble sleeping before riding his bicycle to Target carrying his gun. He did not know what he was going to do, but contemplated shooting himself. When he approached the Plymouth, he thought he saw Thompson bending toward the floor. He fired at Thompson because he believed he was reaching for a gun. The next thing he recalled was fleeing the scene on his bicycle. When a police officer chased him, he "dumped the bike and took off running."

Dr. Wells opined that Nelson's failure to get promoted was a "major occurrence" that changed the way Nelson felt about his life, Target, his coworkers, and Shirley in particular. After Shirley was promoted, Nelson became paranoid, angry, and resentful towards those who played an important role in his life and entered the "early stages of the schizophrenic process." Wells concluded that Nelson was suffering from paranoid schizophrenia on the morning he killed

Shirley and Thompson. He felt Nelson was also suffering from anxiety, dysthymia, and personality disorders due to his dysfunctional family life. Although Wells believed that Nelson suffered from schizophrenia when he shot Shirley and Thompson, he testified that Nelson "was sane at the time" of the murders and was able to think, make decisions, and "come up with his own ideas" and "carry [them] out." Wells concluded that Nelson "doubted himself as a man" and "doubted himself sexually." He concluded that Nelson had tried to function like an adult but he was "just a child" who "had gotten himself involved in a situation . . . far beyond his level of maturity."

Dr. Wells also concluded that Nelson was not malingering. But Wells conceded he had not detected any sign of schizophrenia during their initial meetings and had not reached that diagnosis until he received the psychological test results. Wells acknowledged that he was "surprised" by those test results. He admitted that he had not included in his report that the MCMI interpretation of Nelson's results indicated that Nelson's responses might have indicated a "broad tendency to magnify the level of experienced illness or a categorical inclination to complain and be self-pitying." Wells additionally acknowledged that the results of "validity scales" on Nelson's MMPI test would cause most psychologists to be concerned that Nelson had been lying in his responses. Wells conceded that it was "possible" that Nelson had lied.

### 4. Prosecution's Rebuttal Case

Allen Horner testified that he had been close friends with Nelson since 1988 and they had spent time together on a daily basis until 1991. Their friendship became strained when Nelson became involved with Allen's mother. In 1992, Nelson and Karen stayed with Allen and his family and Allen resumed his friendship with Nelson. Two days before the Target shooting, Nelson spent the

15

day with Allen's family at the Los Angeles County Fair, until 1:00 a.m. Allen testified that Nelson had seemed "normal" and "happy" throughout the day.

Monica Vergara, Thompson's fiancée, testified that they had become engaged to be married nine days before he was killed. During the time that Thompson worked at Target, Vergara saw him every day. Thompson had told her that he and Shirley were friends, and he often had talked to Vergara about Shirley. Vergara never knew Thompson to own a gun.

Forensic Psychiatrist Ronald Markman reviewed the history of the case, Dr. Wells's report on Nelson and the results of the psychological tests Wells administered to Nelson. Dr. Markman testified he could not draw any conclusion about Nelson's mental condition because he had not met with him. But Markman testified that the results of the tests administered to Nelson suggested that Nelson pervasively lied during the testing in an attempt "to look bad" and "exaggerate his condition." Markman believed that Dr. Wells's clinical diagnosis was "simply taken from the test results," which Markman opined were invalid. Markman did not disagree with Wells's diagnosis that Nelson suffered from depression. As to Wells's diagnosis of paranoid schizophrenia, however, Markman testified that if he were to interview a person with paranoid schizophrenia, he could detect symptoms of the illness during their first meeting. He explained that schizophrenia develops over time and that paranoid schizophrenics "may not be significantly impaired in [their] day to day behavior or function." He added that paranoid schizophrenics can have a high "sensitivity to reality" and are able to "think in very exact terms," make plans and decisions in their daily lives, and "weigh and consider pros and cons" of those daily decisions.

16

Detective Dale Nancarrow searched the Plymouth's interior after the bodies were removed. He found no weapons or objects that would have appeared to be weapons. There were no bullet holes anywhere on the outside of the car.

Shirley's mother, Ellis Verdugo, testified that Shirley's children lived with her for two weeks before Easter in 1993 because there had been "some strain" between Shirley and her husband. Shirley saw her husband daily during those two weeks. Afterwards, Shirley and her children moved back in with Shirley's husband and they all lived together until Shirley was killed.

Deputy Sheriff Robert Fowler testified that he had had repeated contact with Nelson since November 1993 when Nelson first appeared in superior court on the murder charges. Deputy Fowler testified that Nelson always was cooperative and never had been classified as requiring "special handling" as a suicide risk or for any other mental or medical problem.

**B.    Penalty Phase**

As noted, there were two penalty phase trials in this case. The first ended in a mistrial after the jury deadlocked. The second will be discussed below.

*1.    Prosecution Case*

The prosecution presented evidence regarding the murders in the Target parking lot similar to that admitted at the guilt phase. In addition, it presented victim impact testimony from victim Robin Shirley's husband Robert, Shirley's mother, victim Lee Thompson's fiancée, and Thompson's mother. Robert Shirley testified that he and Robin Shirley had been married for 11 years and had two young children. Shirley was his best friend, and his life would never be the same without her. Their children were devastated by their mother's death. Ellis Verdugo, Shirley's mother, tested that she and Shirley visited daily and were close. She missed Shirley terribly. Monica Vergara, Lee's fiancée testified they

were to have been married in the fall of 1993. She testified he was always trying to help people and was the only person in her life on whom she could truly depend for support. Thompson's mother Clara testified he was a wonderful son and that his family loved and missed him tremendously. The prosecution also presented testimony from Alex Cosey that, on the day of the shooting, Nelson told him that he had shot two people at Target and that, when the woman made a "grunt noise," he went "back to her and shot her again."

## 2. *Defense Evidence*

Nelson presented evidence from Target employees similar to that admitted at the guilt phase. In addition, some employees testified that they never had seen Nelson exhibit anger towards Shirley or threaten her. Charles McGruder, employee Justin McGruder's father, testified that Nelson visited Justin in the hospital and that Nelson appeared to be a hard-working, career-oriented, gregarious young man. Nelson presented evidence about his childhood from many family members, including evidence of parental neglect, his legal emancipation in March 1992 at the age of 17, his depression, and how he helped his grandmother pay her mortgage.

Family members and friends testified it was completely out of character for Nelson to have committed the murders. Raymond Nieto testified that Nelson told him that he was depressed because he had "been put down" at work and that he had been" in charge" but "they just went over him and didn't give him a promotion." The director of the National Safe Workplace Institute proffered expert testimony regarding perpetrators of workplace violence. Their self-esteem often is heavily dependent on their jobs. When their work situation is threatened, they engage in aggression toward the work environment. They often lack coping skills, have poor impulse control, become isolated, and blame others for a work

18

disappointment. They may seem superficially fine, but are tortured inside. They may engage in behavior uncharacteristic with their past. As they become isolated, they often become irrational and unstable.

## II. GUILT PHASE ISSUES

### A. Expert Opinion

Nelson contends the trial court erred by permitting criminalist Elizabeth Devine to testify it was her expert opinion that Shirley was shot first. He argues that Devine's qualifications for making a shot sequence determination failed to meet the foundational requirements of Evidence Code section 720, subdivision (a) because she lacked crime reconstruction expertise. He argues further that the shot sequence testimony was speculative and therefore unreliable for purposes of Evidence Code section 801, subdivision (b), and the Eighth and Fourteenth Amendments' "heightened reliability" requirement in capital cases.

Where, as here, Nelson raises federal constitutional claims he failed to make at trial, we apply the following analysis: "In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate

constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17; see also *People v. Hartsch* (2010) 49 Cal.4th 472, 493, fn. 19.)

We conclude that the trial court properly admitted Devine's testimony on shot sequence.

### 1. Background

The prosecutor called Elizabeth Devine to testify that, in her expert opinion, the first bullet Nelson fired through the Plymouth's left rear window hit Shirley and the second round hit Thompson in the head. Nelson objected that her proffered testimony on shot sequence lacked the proper foundation and expertise because Devine's area of expertise was serology, not ballistics or crime reconstruction. The court ordered the prosecutor to lay a foundation for Devine's testimony before she could render an opinion on the shot sequence.

Before the jury, Devine testified that she was a senior criminalist with the Los Angeles County Sheriff's Department. Devine explained that a criminalist "analyzes, collects, and uses scientific means to come to some determination about evidence." At the time of trial, she had been employed as a criminalist for nine years. She had a master's degree in forensic science and criminalistics from California State University at Los Angeles, and her course work included death investigations. She had also been trained in bloodstain pattern interpretation. After graduate school, she took advanced courses in crime scene reconstruction and bullet trajectories at the California Criminalistics Institute in Sacramento. She testified that the primary means of learning crime scene reconstruction is field experience. To that end, she had examined at least 300 crime scenes, and her field experience included at least three years of instruction from Ron Lenhart, a renowned expert in bloodstain patterns and crime scene reconstruction. During

that period, Devine evaluated evidence and photographs from crime scenes to answer questions related to reconstruction. At the time of trial, she was working in the serology section of the Los Angeles County crime lab. She explained that, besides collecting blood and other bodily fluids from crime scenes, serologists interpret bloodstain patterns to determine a suspect's position during a shooting and where the victims were located at the time they were shot.

To determine what had happened the morning of the Target shooting, Devine examined the crime scene, interviewed the detectives handling the case, examined photographs of the victims inside the Plymouth, inspected and photographed the car, reviewed the autopsy photographs, reports, and protocol, and talked to the medical examiner who had performed the autopsies. Based on her investigation, Devine concluded that all of the bullets were fired through or into the Plymouth's open left rear window. She testified that she had also developed an opinion regarding which shot had been fired first.

Before she was allowed to give that opinion, defense counsel conducted voir dire on her qualifications. Under defense questioning, she testified she had previously qualified to testify as an expert regarding bullet trajectories, although trajectories were not specifically her area of expertise.

Defense counsel renewed his objection to Devine's expertise to testify about shot sequence. The trial court overruled the objection. It determined that, "based on her education, training and experience," Devine could provide the jury with a "scenario . . . from known facts and opinions with reference to the sequence" of the first shots.

Devine then testified that Shirley was shot before Thompson. She opined that the first bullet fired caused an entrance and exit wound to Shirley's neck and then lodged in the front passenger door, while the second bullet passed through

21

Thompson's temple as his head was turned to the left and then grazed Shirley's upper left shoulder before landing on the front passenger seat behind Shirley. She based her opinion about the sequence of the first two shots on the fact that the driver's seat had been slightly reclined when Thompson was shot in the temple, and in that position the bullet that killed Thompson would have been unable to graze Shirley's left shoulder. Her shoulder would have been accessible to the bullet only if, when it was fired, she was slightly slumped forward. Devine opined that Shirley slumped forward when she was shot in the neck before Thompson was shot.

Regarding expert testimony, the jury was instructed that "[a] person is qualified to testify as an expert if he or she has special knowledge, skill, experience, training or education sufficient to qualify him or her as an expert on the subject to which his or her testimony relates. [¶] A duly qualified expert may give an opinion on questions in controversy at a trial. [¶] To assist you in deciding such questions, you may consider the opinion with the reasons given for, if any, by the expert who gives the opinion. You may also consider the qualifications and credibility of the expert. [¶] You are not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled. You may disregard any such opinion if you find it to be unreasonable."

### 2. Analysis

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "Against the objection of a party, such special knowledge must be shown before the witness may testify as an expert." (*Ibid.*) The witness's "expertise may be shown by any otherwise admissible evidence, including his [or her] own

testimony." (*Id.*, subd. (b).) Evidence Code section 801 provides that "[i]f a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier or fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

"The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation.] ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility." ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322.)

Devine's training in the examination of crime scenes, crime scene reconstruction, bullet trajectories, and bloodstain pattern analysis was sufficient to permit her to render an opinion on shot sequence. It was not necessary for the scope of Devine's employment to be specifically focused on that subject matter. (*People v. Robinson* (2005) 37 Cal.4th 592, 632. ["the opinion evidence here at issue did not require that the witness have expertise *beyond* that which was shown"].) Accordingly, we conclude that the trial court did not abuse its discretion in deciding that Devine was qualified to render an opinion on shot sequence (Evid. Code, § 720, subd. (a); *People v. Fuiava* (2012) 53 Cal.4th 622, 672), that Devine's challenged opinion was the proper subject of expert testimony

23

(Evid. Code, § 801; *People v. McDonald* (1984) 37 Cal.3d 351, 367), and that the evidence Devine relied on in reaching her opinion that Shirley was shot first was not speculative, but was of a "type that reasonably may be relied upon by an expert in forming an opinion." (Evid. Code, § 801, subd. (b); see *People v. Jones* (2012) 54 Cal.4th 1, 59-61.)

Defense counsel was entitled to present his own expert as a defense witness on the issue of shot sequence but did not do so. Defense counsel also was entitled to challenge the persuasive value of Devine's opinion on shot sequence through cross examination, which he did. As noted, questions regarding the validity or the credibility of an expert's knowledge are matters for the jury to decide (*People v. Bolin*, *supra*, 18 Cal.4th at p. 322) but do not provide a basis for excluding the expert's testimony in the first instance and did not do so in this case.

Having concluded that the court did not abuse its discretion in admitting Devine's opinion testimony that Shirley was shot first, we find no merit in Nelson's claim that Devine's "unsupported" opinion on shot sequence violated any federal constitutional right. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1229 [" '[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe upon a capital defendant's constitutional rights' "].)

## B. Heat of Passion Instruction

Nelson contends the trial court prejudicially erred by refusing to instruct the jury on voluntary manslaughter based on heat of passion. We conclude the claim is without merit because there was insufficient evidence in the record to warrant such instructions.

At trial, defense counsel argued that the jury should be instructed on voluntary manslaughter based on heat of passion as to both victims. He asked the trial court to instruct the jury with CALJIC No. 8.42, which explains the doctrine

24

of heat of passion, and with CALJIC No. 8.44, which explains that no specific emotion constitutes heat of passion. Counsel also proposed four pinpoint instructions on heat of passion. Defense counsel argued that the evidence showed that Nelson killed the victims in a fit of jealous rage when he discovered Shirley, with whom he was in love, with his rival, Thompson.

The trial court denied the requested heat of passion instructions on the ground that the evidence did not support them. It ultimately instructed the jury on first degree murder based on premeditation and deliberation as well as lying in wait, unpremeditated second degree murder, second degree malice murder, voluntary manslaughter committed with the honest but unreasonable belief in the need to defend oneself as to Thompson, and involuntary manslaughter.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Manslaughter is the unlawful killing of a human being without malice." Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter. Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. (§ 192, subd. (a); *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

"An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense." (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) The "substantial evidence requirement is not satisfied by ' "*any* evidence . . . no matter how weak," ' but rather by evidence from which a jury could conclude 'that the lesser offense, but not the greater, was committed.' " *(People v. Avila* (2009) 46 Cal.4th

680, 705.) "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

The fundamental inquiry when examining heat of passion in the context of manslaughter " 'is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 948 (*Beltran*).) Heat of passion is "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Id*. at p. 942.) Further, the "proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment." (*Id*. at p. 938.)

This, however, "does not mean that a defendant does not form malice unless he thinks rationally or exercises sound judgment." (*Beltran*, *supra*, 56 Cal.4th at p. 950, italics omitted.) For purposes of the heat of passion doctrine, "provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment." (*Ibid*.) The standard requires more than evidence that a defendant's passions were aroused. The facts and circumstances must be " 'sufficient to arouse the passions of the ordinarily reasonable man.' " (*Ibid.*) Moreover, the defendant must "*actually* be motivated by passion in committing the killing;" that is, he or she must be acting " ' "under the smart of that sudden quarrel or heat of passion." ' "

26

(*Id.* at p. 951.) Accordingly, it is not sufficient that a person "is provoked and [then] *later* kills." (*Ibid.*)

Defendant advances the following scenario in support of his claim that heat of passion instructions were warranted in this case: "An adolescent boy fell in love with his coworker, a relentless flirt who egged on the boy as she did others. He went to see her early one morning before she started work. He approached her truck, only to find it empty. Nearby was a brown car that the teenager did not recognize. He looked in the car and was shocked to see the object of his desire cuddling with a man. He was further shocked to see that the man was another coworker who was the youth's rival. Enraged and out of control, the teen used the gun he carried for protection to shoot and kill the couple." Defendant fails to provide any citation to the record that would provide an evidentiary basis for this scenario.

Defendant presented no evidence he was in love with Shirley or that she "egged" him on. While Nelson's witnesses testified Shirley was flirtatious toward other male employees, they also testified she did not like Nelson in a romantic way. Nelson himself told Dr. Wells that although he and Shirley were friendly, they did not have "an intimate or romantic" relationship. Nor did Nelson present any evidence that his alleged romantic feelings for Shirley drove him to look for her at the Target parking lot on the morning of the murders. The only evidence he presented regarding his motivation for being in the parking lot were his statements to Dr. Wells that he was suffering from insomnia and "went to the Target Center without any clear idea of what he was going to do," but that he thought he might shoot himself. Furthermore, Nelson told Wells that he shot Thompson, not because he found Thompson with Shirley, but because he thought Thompson was reaching for a gun. Moreover, regarding the victims' relationship, although there

27

was evidence Shirley thought Thompson was "very cute," there was no evidence they were romantically involved.  In short, Nelson failed to present substantial evidence that he killed the victims in a moment of jealous rage.

The improbability of this jealous rage scenario would also have been underscored for the trial court by the prosecution's strong evidence that the murders were motivated by Nelson's anger at having been passed over for a promotion in favor of Shirley, his work conflicts with Thompson, and the strong evidence of premeditation and deliberation.

Nelson's further claim that Karen Horner's disparaging comments about Shirley aroused his passions and provoked him fails because " '[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' " (*People v. Moye* (2009) 47 Cal.4th 537, 549–550.)  Moreover, even if we assumed Horner's comments incited Nelson, that incitement must be objectively sufficient " 'to arouse the passions of the ordinarily reasonable man.' " (*Beltran, supra,* 56 Cal.4th at p. 950.)  Horner's statements fail that test.

Because no jury composed of reasonable persons could have concluded that when Nelson shot and killed Shirley and Thompson, he "simply react[ed] from emotion due to . . . provocation, without deliberation or judgment" (*Beltran*, *supra*, 56 Cal.4th at p. 950), the trial court properly refused his heat of passion instructions.  In light of this conclusion, the trial court's supposedly erroneous statements regarding heat of passion Nelson mentions are of no moment.

Nelson contends that the trial court's failure to instruct on heat of passion deprived him of his rights to due process, a fair trial, trial by jury, confrontation and cross-examination, presentation of a defense, effective assistance of counsel,

equal protection, and reliable guilt and penalty phase verdicts in a capital case, guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. Citing *Beck v. Alabama* (1980) 447 U.S. 625 (*Beck*), he contends the federal Constitution requires instruction on lesser included offenses in capital cases.

In *Beck*, the United States Supreme Court held that a sentence of death violates the Fourteenth Amendment when the jury was not permitted to consider a verdict of guilt for a lesser included noncapital offense and " 'the evidence would [have] permit[ted] a jury rationally to find [the defendant] guilty of the lesser included offense and acquit him of the greater.' " (*Beck*, *supra*, 447 U.S. at p. 635.)  As demonstrated, however, the evidence would not have supported a conviction for voluntary manslaughter based on a heat of passion theory. Accordingly, *Beck* is not implicated.  In any event, *Beck's* principles are satisfied if the jury was provided some noncapital third option between the capital charge and acquittal.  (*Schad v. Arizona* (1991) 501 U.S. 624, 647; see *People v. Sakarias* (2000) 22 Cal.4th 596, 621 fn. 3; *Breverman*, *supra*, 19 Cal.4th at p. 167.)  Here, where the jury was provided with the option of first degree murder without special circumstances, or of second degree murder on two separate theories, or manslaughter, we find no due process or other federal constitutional error.

## C.     Provocation Instructions

Nelson contends that the trial court committed prejudicial error by refusing to give the jury two instructions regarding provocation.  He contends that the trial court's failure to give these instructions deprived him of his federal constitutional right to adequate instructions on the defense theory of the case and of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

29

We conclude the trial court properly denied the requested instructions because there was insufficient evidence to warrant them.

Defense counsel asked the trial court to instruct the jury pursuant to CALJIC No. 8.73 as follows: "If evidence established that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing [it] may have on whether the defendant killed with or without deliberation and premeditation." Counsel also requested a defense instruction that stated: "In deciding whether or not you are convinced beyond a reasonable doubt that the defendant deliberated and premeditated, you should consider the effects of provocation on the defendant at the time of the killings. This provocation may come from any person, including persons other than the victims." The trial court rejected both instructions.

"The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state." (*People v. Ward* (2005) 36 Cal.4th 186, 215.) "[U]nder the principles expressed in CALJIC No. 8.73, provocation is relevant only to the extent it 'bears on the question' whether defendant premeditated and deliberated. [Citation.] Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' . . . , and need not be given on the court's own motion. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879.) However, on request, a criminal defendant is entitled to pinpoint instructions that relate particular facts to an element of the charged offense and highlight or explain a theory of the defense if the instructions are supported by substantial evidence. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778.)

According to Nelson, the question "is whether there was substantial evidence that [Nelson] was subjectively provoked into the shootings by unexpectedly seeing [the victims] together in an intimate setting." As demonstrated in the previous part, there was no evidence to support Nelson's assertion either that he was in love with Shirley or that Shirley and Thompson were intimately involved. Thus, there was no evidentiary basis for the instructions based on a theory Nelson was provoked by a jealous rage upon seeing the victims together. Nelson also suggests he could have been provoked by his residual anger at having been passed over for the promotion in favor of Shirley. But this theory relies on the fortuity of Nelson having been in the Target parking lot, when there was strong evidence of deliberation and premeditation: he painted his bicycle black, he armed himself, he went to where he knew Shirley would be, and he sneaked up on the victims. Even if we were to credit Nelson's statement to Dr. Wells that he did not know why he went to the Target parking lot, his explanation of why he killed the victims does not support his provocation theory. He told Dr. Wells he shot the victims because he thought Thompson was reaching for a gun, not because his anger at having been passed up for the promotion flared up when he saw the two victims together. Accordingly, there was an insufficient evidentiary basis for the instructions, and the trial court did not err in declining to give them.

Finally, Nelson contends the trial court erred in refusing to instruct that provocation may come from a person other than a victim. Because there was insufficient evidence of any provocation, the trial court did not err by declining to give the third-party provocation instruction.

31

## D. Mental States for First Degree Murder

Nelson contends that the trial court committed prejudicial error by modifying CALJIC No. 2.02 (Sufficiency of Evidence to Prove Specific Intent or Mental State) and giving an instruction that combined CALJIC No. 3.31 (Concurrence of Act and Specific Intent) and CALJIC No. 3.31.5 (Mental State). (All cites to CALJIC are to the fifth edition, 1998 unless otherwise noted.) He argues that the modified instructions "relieved the jury from finding both specific intent and the mental states of first degree murder" and thus "permitted the jury to find first degree murder without finding deliberation so long as the jury found a specific intent to kill."

The Attorney General argues the claim is not preserved for review because Nelson did not object at trial. The claim, however, is that the instruction misstated the elements of the crime, an assertion that may be considered on appeal despite the absence of an objection below. (§ 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

The trial court instructed the jury with the following version of CALJIC No. 2.02 (1992 rev.) (5th ed. 1988): "The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of the crimes charged unless the proved circumstances are not only consistent with the theory that the defendant had the required specific intent or mental state, but cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to any such specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state, and the other to the absence of the specific intent or mental state, you must adopt that interpretation which points to the absence of the specific intent or

32

mental state.  [¶] If, on the other hand, one interpretation of the evidence as to such specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."  The court modified CALJIC No. 2.02 by adding the following language to the instruction:  "The specific intent or mental state as to each crime or lesser crime is defined elsewhere in these instructions."

The trial court also read the jury an instruction that combined CALJIC Nos. 3.31 and 3.31.5 (1992 rev.) (5th ed. 1988):  "In the crimes charged in the information and the lesser crimes there must exist a union or joint operation of act or conduct, and a certain mental state or specific intent in the mind of the perpetrator.  Unless such mental state or specific intent exists, the crime to which it relates is not committed.  [¶]  The mental state or specific intent required are included in the definitions of the crimes set forth elsewhere in these instructions.

Nelson argues that the disjunctive language "specific intent *or* mental state" misled the jury as to the requirements for first degree murder because it improperly "permitted the jury to find first degree murder without finding deliberation so long as the jury found a specific intent to kill."  (See CALJIC No. 8.20 (Deliberate and Premeditated Murder) ["All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree"]; *People v. Swain* (1996) 12 Cal.4th 593, 601 ["proof of an unlawful 'intent to kill' is the functional equivalent of express malice "].)  He argues further the instructional error was compounded by weak evidence of deliberation.

"When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions as a whole, not in isolation.  [Citation.] 'For ambiguous instructions, the test is whether there is a reasonable likelihood

33

that the jury misunderstood and misapplied the instruction.' " (*People v. Rundle* (2008) 43 Cal.4th 76, 149.)

Even if we assume the language cited by Nelson in the instructions given pursuant to CALJIC Nos. 2.02 and 3.31/3.31.5 was potentially misleading, we cannot agree that this ambiguity posed a substantial risk of misleading the jury into believing it need not find deliberation — the claimed absence of which was the centerpiece of defendant's defense — to convict him of first degree murder.

Both the instruction based on CALJIC No. 2.02 and the instruction based on combined CALJIC Nos. 3.31/3.31.5 directed the jurors to other instructions for the definitions of the specific intent or mental state for the crimes and lesser crimes. Thus, the jurors would have known they had to look beyond these instructions for the specific requirements of first degree murder. Those requirements were set forth in CALJIC No. 8.20, which informed the jury that "[a]ll murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] The word 'willfull,' as used in these instructions, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of the careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder in the first degree." The instruction goes on to state that "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and consider the question for killing and the reasons

34

for and against such a choice and, having in mind the consequences, he decides to and does kill." (*Ibid.*) The portions of CALJIC No. 8.20 set forth above explicitly informed the jury that it must find both the required specific intent and the required mental states of first degree murder. Accordingly, contrary to Nelson's assertion, CALJIC 8.20 was a more specific instruction than CALJIC Nos. 2.02 and combined CALJIC Nos. 3.11/3.11.5 on the issue of the requirements for first degree murder.

Moreover, both the prosecutor and defense counsel emphasized in argument the correct interpretation of the instructions on this point. The prosecutor discussed deliberation and specific intent during argument as two distinct elements of proof both of which were required to convict for first degree murder. Thereafter, defense counsel stressed that first degree murder requires proof of an intent to kill and premeditation and deliberation. Defense counsel argued that the instruction that defines what constitutes "a deliberate and premeditated" first degree killing "is the whole crux of the case." Thus, nothing in the parties' arguments suggested that the jury need not find all the elements of the crimes to have been proven beyond a reasonable doubt. (Cf. *People v. Hughes* (2002) 27 Cal.4th 287, 341(*Hughes*) [any ambiguity in voluntary manslaughter instruction not prejudicial in light of instructions as a whole, "evidence presented to jury," and "counsels' legally correct arguments"].)

Finally, we disagree with Nelson's assertion that the evidence of deliberation was weak. To summarize, the evidence of Nelson's careful planning included painting his bicycle black, arming himself, going to a location when he expected to find his victims, concealing his bicycle, approaching his victims on foot and in dark clothes to gain the element of surprise, and when his initial shots

35

evidently failed to immediately kill them, retracing his steps and firing additional shots into the vehicle.

Thus, in light of the instructions as a whole, the argument of counsel and the evidence presented to the jury regarding Nelson's deliberation, we do not believe it is either reasonably likely the jury was misled to defendant's prejudice regarding the requirements for first degree murder or that the instructions "operate[d] in the manner asserted by defendant, essentially precluding consideration of his primary defense." (*Hughes, supra,* 27 Cal.4th at p. 341.) Therefore, we also need not reach his claims that the alleged instructional error violated his federal constitutional rights.

### E.     CALJIC No. 2.70

Nelson contends that the trial court committed prejudicial error by instructing the jury with CALJIC No. 2.70 (Confession and Admission — Defined) because there was no evidence of a confession. He argues that the inclusion of a confession instruction suggested to the jury he had acknowledged that he was guilty of first degree murder, thereby admitting deliberation. Moreover, he asserts the instruction suggested that the jury should "disbelieve that [he] killed in self-defense" based on his statement to Dr. Wells that, as Nelson approached the car, he thought Thompson was reaching for a gun and shot him. Nelson additionally contends that the instruction on confessions "impliedly directed a verdict," thus violating his rights under various federal constitutional provisions. (U.S. Const., 6th, 8th & 14th Amends.) We reject the claim.

At trial, defense counsel objected to CALJIC No. 2.70 on the ground that Nelson had made admissions but not a confession. The trial court acknowledged there was no confession but chose to instruct on both confessions and admissions. The court reasoned that instructions on both would clarify the distinction between

36

them so that the jurors would not "talk[] about confessions [when] really all they are talking about is admissions."

Accordingly, the trial court instructed the jury, pursuant to CALJIC No. 2.70, as follows: "A confession is a statement made by a defendant, other than at his trial, in which he has acknowledged his guilt of the crimes for which he is on trial. [¶] In order to constitute a confession, such a statement must acknowledge participation in the crimes as well as the required criminal intent state of mind. An admission is a statement made by the defendant other than at his trial, which does not by itself acknowledge his guilt of the crimes for which such defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made a confession [or an admission] and if so, whether such statement is true in whole or in part. [¶] You should find — [if] you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true. [¶] Evidence of an oral confession [or an oral admission] of the defendant should be viewed with caution."

The trial court then instructed the jury with CALJIC No. 2.71 (Admission — Defined) as follows: "An admission is a statement made by the defendant other than at his trial which does not by itself acknowledge his guilt of the crimes for which the defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. [¶] If you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in

37

part, you may consider that part which you find to be true. [¶] Evidence of an oral admission of the defendant should be viewed with caution."

" 'On review even if an erroneous instruction is included reversal is required only when it appears the error was likely to have misled the jury.' " (*People v. Malone* (1988) 47 Cal.3d 1, 52.) Assuming the instruction should not have been given, we conclude there was no reasonable likelihood the jury would be misled by this instruction. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.) In giving CALJIC No. 2.70, the trial court did not express an opinion on the issue of guilt and impliedly direct a verdict. To the contrary, CALJIC No. 2.70 specifically informed the jurors that they were "the exclusive judges" as to whether a confession or admission was made and whether it was true, in whole or part. The court also gave CALJIC No. 17.31, which informed the jury that "[w]hether some instructions apply will depend upon what you find to be the facts. You are to disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given I am expressing an opinion as to the facts." These interrelated instructions ensured that the jury understood that the court was not expressing an opinion regarding whether Nelson had made either a confession or admissions.

On a related note, Nelson argues a reasonable juror could have construed the language in the instruction to view with caution evidence of a confession to mean the juror should discount statements he made to Dr. Wells that he shot Thompson in self-defense. But other than Nelson's statement to Dr. Wells, there was no evidence he acted in self-defense when he shot Thompson, and defense counsel did not argue to the jury that he killed Thompson in self-defense. Thus, even if the instruction was misleading in this case, Nelson fails to show prejudice.

38

Citing *Beck* and related cases, Nelson contends this instructional error deprived him of his right to reliable fact finding in a capital case under the Eighth and Fourteenth Amendments to the federal Constitution. We find no due process or other federal constitutional error.

### F. CALJIC No. 3.32

Nelson contends that the trial court prejudicially erred by instructing the jury with the 1992 revised version of CALJIC No. 3.32 (Evidence of Mental Disease — Received for Limited Purpose). Nelson contends the instruction violated his rights under various provisions of the federal Constitution. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

The trial court instructed the jury pursuant to CALJIC No. 3.32: "Evidence has been received regarding a mental disease, mental defect or mental disorders of the defendant Sergio Nelson [at] the time of the commission of the crimes charged, namely first degree murder in count 1 and 2, and the lesser crimes thereto, namely second degree murder, voluntary manslaughter and involuntary manslaughter. You may consider such evidence solely for the purpose of determining whether . . . defendant . . . actually premeditated, deliberated, harbored malice aforethought, and/or intent to kill, which is — which are elements of the crimes charged in counts 1 and 2, and one of which namely malice aforethought is an element of the lesser crime of second degree murder."

The trial court rejected Nelson's alternative proposed instruction, which would have informed the jurors that "[i]n the crime of murder, which the defendant is accused, in count 1 and 2 of the information, express malice aforethought, premeditation, and deliberation are necessary mental state [*sic*] to a finding of first-degree murder. [¶] If you find that the defendant had a mental defect, disease, or disorder, at the time of the alleged crime, you should consider

that fact in determining whether the defendant had such mental state. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed any such mental state, you must find that he did not have such mental state." In rejecting Nelson's proposed language, the trial court noted that CALJIC No. 3.32 included the phrase "You may consider such evidence." In 1996, after Nelson's 1994-1995 trial, CALJIC No. 3.32 was modified to state, "You should consider evidence. . . ." (CALJIC No. 3.32 (6th ed. 1996).)

"Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).) As the trial court noted, at the time of Nelson's trial in December 1994, CALJIC No. 3.32 contained the phrase "You may consider."

Even assuming error, there is no reasonable likelihood the jury would have construed the instruction in the manner that Nelson asserts. Nelson focuses on a single phrase in the instruction but the correctness of a given instruction is determined by consideration of the entire instruction, not from a consideration of its parts. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) CALJIC No. 3.32 is a limiting instruction. Such instructions confine the application of certain evidence to particular issues to which the jury is directed. In this case, CALJIC No. 3.32 limited the jury's consideration of evidence of mental disease, defect, or disorder to Nelson's actual ability to form the requisite criminal intent or other mental states for the charged offenses. Viewed as a whole, we conclude it is not reasonably likely the jury would have seized upon the use of "may" in the instruction as license to disregard evidence of the effect his mental condition on the charged offenses.

Nelson next contends the "and/or" language in the instruction was ambiguous and confusing for two reasons. He claims it may have permitted the jury to convict him of first degree murder even though it found only intent to kill and not premeditation and deliberation. Alternatively, he argues the "and/or" language may have misled the jury to believe it could consider evidence of his mental condition on all elements or just one of them. To the extent his claim is a reiteration of his criticism of the use of the disjunctive language in CALJIC No. 2.02, it is not more persuasive in this context than in that one. As to his second point, we are not persuaded there was a reasonable likelihood the jury would have parsed the instruction in the manner defendant urges. Moreover, because other instructions required the jury to find both specific intent (and therefore express malice) and premeditation and deliberation to convict Nelson of first degree murder (*ante*, at pp. 32-36), had the jury concluded his mental condition precluded him from actually forming one of the elements, it would necessarily have found him not guilty of the greater charge. It did not.

## G.    Lying-in-Wait Instruction

Nelson contends that the trial court erred by instructing the jury on the first degree murder theory of lying in wait (§ 189) and the lying-in-wait special-circumstances allegations (§ 190.2, subd. (a)(15)) because there was insufficient evidence to support the instructions. We agree.

"At the time of defendant's crime[s], the special circumstance required that the murder be committed 'while lying in wait.' [Fn. omitted.] [Citations.] Also, at that time, 'the requirements of the lying-in-wait special circumstance were slightly different from, and more stringent than, the requirements for lying-in-wait first degree murder. [Citation.] Whereas lying-in-wait first degree murder required only that the murder be perpetrated ' "by means of" ' lying in wait

41

(§ 189), the lying-in-wait special circumstance applied to murder committed ' "*while* lying in wait. (§ 190.2, former subd. (a)(15), italics added.)" ' [Citation.] Further, the lying-in-wait special circumstance requires intent to kill, while lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death. [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 246.) The "language of the lying-in-wait special circumstance was [revised in March 2006] to delete the word 'while' and substitute the phrase 'by means of.' " (*Id.,* at p. 246, fn.7.)

The lying-in-wait special circumstance requires proof of "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Morales* (1989) 48 Cal.3d 527, 557.) "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " (*People v. Sims* (1993) 5 Cal.4th 405, 432-433; see *People v. Combs* (2004) 34 Cal.4th 821, 853.) "[T]he issue we must determine is whether there was substantial evidence to support a jury verdict based on that theory." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139, fn. 1.) If we find that "the evidence supports the special circumstance, it necessarily supports the theory of first degree murder." (*People v. Carpenter* (1997) 15 Cal.4th 312, 388.)

Whether we review Nelson's claim as asserted instructional error in giving the lying-in-wait instruction, erroneous denial of his motion for an acquittal based on a claim of insufficient evidence for lying in wait, or insufficiency of the evidence supporting the jury's verdict, we apply essentially the same standard.

42

(See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1182.) We "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) In determining whether a reasonable trier of fact could have found Nelson guilty beyond a reasonable doubt, we presume in support of the judgment " 'the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Nelson asserts that the prosecution failed to prove he engaged in "a substantial period of watching and waiting for a favorable or opportune time to act." (*People v. Gurule* (2002) 28 Cal.4th 557, 630.) The standard CALJIC instructions for lying in wait as a theory of first degree murder and for the lying-in-wait special-circumstance allegation that were given in this case explained that "[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." (CALJIC No. 8.81.15 (1989 rev.) (5th ed. 1988) (Special Circumstances — Murder While Lying in Wait); see also CALJIC No. 8.25) Although the period of time must be substantial, we have "never placed a fixed time limit on this requirement." *(People v. Moon* (2005) 37 Cal.4th 1, 23 [defendant's testimony that he waited 90 seconds after the victim returned home before killing her was sufficient evidence of lying in wait under the special circumstance allegation].)

The evidence showed, directly or by reasonable inference, that Nelson rode his bicycle to the area near the Target parking lot, where he had reason to believe the victims would be waiting to go to work. He concealed his bicycle and came

43

up behind his victims on foot to take them by surprise. He shot the two victims in quick succession. After ensuring his victims were dead by shooting them a second time, he retrieved his bicycle and left.

There is no evidence, however, that Nelson arrived before the victims or waited in ambush for their arrival. In the absence of such evidence, there is no factual basis for an inference that before approaching the victims, he had concealed his bicycle and waited for a time when they would be vulnerable to surprise attack. The jury was presented with no evidence from which it could have chosen, beyond a reasonable doubt, that scenario over one in which defendant arrived after the victims, dismounted from his bicycle, and attacked them from behind without any distinct period of watchful waiting.

In *People v. Carter* (2005) 36 Cal.4th 1215, there was evidence that the defendant entered the victim's apartment intending to rob her. Evidence of wood chips near the front door indicated that the entry was forcible. There was also the testimony of a percipient witness who heard a car with its engine running near the apartment. In support of the jury's true finding on the lying-in-wait special circumstance, the Attorney General argued that the evidence tended to show that the defendant broke into the victim's apartment before she arrived and waited for her. We rejected that theory: "The evidence in support of the lying-in-wait special circumstance—essentially, the wood chips and the car with its engine running—appears unduly reliant upon the *inference* suggested by the prosecution that defendant arrived prior to Cullins's return home in order to attack her *by surprise*. The wood chip evidence tended to show forced entry, not that the entry occurred prior to Cullins's arrival. Cullins may have arrived at her apartment before defendant did, and he may have forced his way in while she was undressing elsewhere in the apartment. Under the latter scenario, the lying-in-wait special

44

circumstance would rely upon the neighbor who heard the car engine running, and the time of that event cannot be pinpointed.  Moreover, the car idling, besides occurring at an uncertain time, does not strongly imply that defendant was waiting in the car to attack Cullins; if defendant had planned a home invasion when Cullins arrived home, he likely would have turned off the engine so as not to attract attention. We therefore set aside the special circumstance of lying in wait." (*Id.* at pp. 1261-1262.)

Similarly here, there is no substantial evidence to support the inference that Nelson arrived at the murder scene before the victims arrived.  Nor was it suggested in *Carter* that the time the defendant took to carry out the murder plan — in particular, to gain forced entry and approach the victim — itself constituted a period of watching and waiting that could give rise to the lying-in-wait special circumstance, even though such forced entry and approach no doubt took a substantial period of time.  Although a brief period of watching and waiting may suffice to support the lying-in-wait special circumstance (see *People v. Moon*, *supra*, 37 Cal.4th at p. 23), the evidence here does not support any such period.  Contrary to the concurring and dissenting opinion, the fact that there was substantial evidence of premeditation and deliberation does not necessarily mean there was substantial evidence of watching and waiting for an opportune time to act.  (See *People v. Sandoval* (2015) 62 Cal.4th 394, 424.)

Nelson contends that because the jury was instructed on lying in wait as a basis of first degree murder, the first degree murder verdict must also be reversed. But there was sufficient evidence of the primary prosecution theory of first degree murder based on premeditation and deliberation.  A first degree murder verdict will be upheld if there is sufficient evidence as to at least one of the theories on which the jury is instructed, "absent an affirmative indication in the record that the

45

verdict actually did rest on the inadequate ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) There is no such affirmative indication here, and the first degree murder verdict must therefore be upheld. Moreover, Nelson remains eligible for the death penalty based on the multiple-murder special circumstance.

### H. Consciousness of Guilt Instruction

Nelson contends the trial court committed federal and state constitutional error by instructing the jury with CALJIC Nos. 2.03 (Consciousness of Guilt — Falsehood), 2.06 (Efforts to Suppress Evidence), and 2.52 (Flight After Crime). Nelson first argues that these consciousness of guilt instructions are unnecessary as well as unfairly argumentative and partisan. We have rejected this argument. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1075.)

Nelson next argues that the instructions allow the jury to draw irrational permissive inferences of consciousness of guilt. We have rejected this claim in many cases, including *People v. Boyette* (2002) 29 Cal.4th 398, 438, and do so again here.

### I. Motive Instruction

As relevant here, the trial court instructed the jury with CALJIC No. 2.51 (Motive) as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence." Nelson contends that this instruction allowed the jury to determine guilt based on the presence of an alleged motive only and thereby lessened the prosecution's burden of proof. We previously have rejected this claim and do so again here. (*People v.*

*Capistrano* (2014) 59 Cal.4th 830, 876-877 (*Capistrano*); *People v. Jones* (2013) 57 Cal.4th 899, 971.)

### J. CALJIC No. 2.90

Nelson contends that the standard instruction defining the presumption of innocence and reasonable doubt that was given in this case, CALJIC No. 2.90, was constitutionally defective and violated his federal due process rights. Because CALJIC No. 2.90 tracks the language of section 1096, a "court satisfies its statutory obligation to instruct on these principles by giving CALJIC No. 2.90 . . . ." (*People v. Aranda* (2012) 55 Cal.4th 342, 353.) The "constitutionality of CALJIC No. 2.90 has been ' "conclusively settled" ' " (*Capistrano*, *supra*, 59 Cal.4th at p. 879), and Nelson does not persuade us to reconsider our prior decisions upholding its constitutionality.

In two related claims, Nelson contends that CALJIC No. 2.90 failed to inform the jury that the presumption of innocence continues throughout the entire trial, including through deliberations. We rejected a similar claim in *People v. Lewis* (2001) 25 Cal.4th 610, 651–652. We are not persuaded to reach a different result in the present case.

### K. Dilution of Reasonable Doubt Standard

#### *1. Circumstantial Evidence Instructions*

Nelson contends that, in combination with CALJIC No. 2.90, four standard instructions given at his trial that discuss the relationship between circumstantial evidence and reasonable doubt individually and collectively undermined the requirement of proof beyond a reasonable doubt: CALJIC Nos. 2.01 (Sufficiency of Circumstantial Evidence — Generally), 2.02 (Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State), 8.83 (Special Circumstances — Sufficiency of Circumstantial Evidence — Generally), and

8.83.1 (Special Circumstances — Sufficiency of Circumstantial Evidence to Prove Required Mental State). He also claims that the instructions denied him his rights to due process, to a trial by jury, and to a reliable capital trial.

Each of the challenged instructions advises the jury that if one interpretation of the evidence "appears to you to be reasonable and the other interpretation appears to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." Nelson argues that this language compelled the jury find him guilty on all counts and to find the special circumstance to be true using a standard of proof lower than the constitutionally mandated proof beyond a reasonable doubt because the jury was told it "must" accept an incriminatory interpretation of the evidence if it "appeared" to them to be "reasonable." He also argues that the instructions created "an impermissible presumption that required the jury to accept any incriminatory interpretation of circumstantial evidence unless [Nelson] rebutted the presumption by producing a reasonable exculpatory interpretation."

We previously have rejected both of these claims, and we decline to reconsider our holdings in those prior decisions. (See *Capistrano*, *supra*, 59 Cal.4th at p. 875; *People v. Jurado* (2006) 38 Cal.4th 72, 126–127; *People v. Nakahara* (2003) 30 Cal.4th 705, 714.)

### 2. *"Dilution" of Reasonable Doubt Standard*

Nelson contends five additional standard instructions individually and collectively diluted the requirement of proof beyond a reasonable doubt: CALJIC Nos. 1.00 (Respective Duties of Judge and Jury), 2.22 (Weighing Conflicting Testimony), 2.27 (Sufficiency of Testimony of One Witness), 2.51 (Motive), and 8.20 (Deliberate and Premeditated Murder). Nelson argues that each of these instructions urged the jury to decide material issues by determining which side had

48

presented relatively stronger evidence and therefore implicitly replaced the reasonable doubt standard with a preponderance of the evidence standard. He also claims that some of these instructions erroneously told the jury that it should decide between guilt or innocence "instead of determining if guilt [has] been proven beyond a reasonable doubt."

We previously have rejected both of these claims as to a variety of instructions, including CALJIC Nos. 1.00, 2.01, 2.21.2, 2.22, 2.27, 2.51, 2.52, 8.20, and 8.83. (See *People v. Casares* (2016) 62 Cal.4th 808, 831; *Capistrano*, *supra*, 59 Cal.4th at p. 876; *People v. Jones*, *supra*, 57 Cal.4th at pp. 972-973; *People v. Vines* (2011) 51 Cal.4th 830, 885; *People v. Kelly* (2007) 42 Cal.4th 763, 792; *People v. Crew* (2003) 31 Cal.4th 822, 848.) Nelson advances no persuasive arguments to warrant reconsideration of our holdings regarding these instructions, and we decline to reconsider our prior decisions.

**L.       Instructions on "Uncharged" First Degree Murder**

Nelson contends that the trial court erred by instructing the jury on first degree murder because the information only charged him with a violation of section 187, subdivision (a), which he characterizes as a statute defining "second degree malice murder." Relying on his reading of our decision in *People v. Dillon* (1983) 34 Cal.3d 441, 475, Nelson argues that because the information charged only second degree murder, the trial court lacked jurisdiction to try him for first degree murder. We have held to the contrary in *Hughes*, *supra*, 27 Cal.4th at pages 368-370, and in several other cases. (See, e.g., *People v. DeHoyos* (2013) 57 Cal.4th 79, 143-144; *People v. Howard* (2010) 51 Cal.4th 15, 35; *People v. Morgan* (2007) 42 Cal.4th 593, 616.) We decline to reconsider our precedent.

Nelson next contends that regardless of how we construe our state statutes defining murder, the federal Constitution requires more specific pleading in this

context.  He premises this argument on his reading of *Apprendi v. New Jersey* (2000) 530 U.S. 466, 476.  We previously have concluded that this " '*Apprendi* claim is illusory' " because the information included special circumstance allegations.  (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 144; see also *Capistrano*, *supra*, 59 Cal.4th at pp. 878-879.)  We reject this claim here as well.  In turn, we conclude that permitting the jury to convict Nelson of first degree murder and to find the special circumstance allegations to be true did not violate Nelson's right to due process or his right to a fair and reliable capital guilt trial.

### M.    Voluntary Manslaughter Instruction

Nelson contends that the trial court erred by refusing to instruct the jury on the defense theory of voluntary manslaughter based on the mitigating evidence of his mental disorder, and instead instructing only on *involuntary* manslaughter based on a mental illness theory.  He argues further that he "presented substantial mitigating evidence that, due to his severe mental disorder, he did not actually harbor malice aforethought."

Defense counsel asked the trial court to instruct the jury on voluntary manslaughter as to both Shirley and Thompson based on the theory that Nelson's mental illness negated malice.  The trial court denied Nelson's request.  Instead, the court instructed the jury that "[i]f you find that the defendant was suffering from a mental illness at the time of the acts alleged and because of that mental illness did not actually have the mental state of malice and did not intend to kill, then the defendant is not guilty of murder but is guilty of involuntary manslaughter."  It also properly instructed, pursuant to CALJIC No. 3.32 (1992 rev.) (5th ed. 1988) (Evidence of Mental Disease — Received for Limited Purpose), that the jury could consider evidence of a mental disease, defect, or

50

disorder solely for the purpose of determining whether Nelson "actually premeditated, deliberated, harbored malice aforethought and/or intent to kill."

Nelson argues that based on Dr. Wells's testimony, he was "suffering from paranoid schizophrenia on the morning of the shootings" and that his "severe mental disorder" caused him to have "tendencies to misinterpret social situation[s]" and be "delusional." To the extent Nelson is asserting a diminished capacity defense, that defense had been abolished before the crimes. (*People v. Saille* (1991) 54 Cal.3d 1103, 1114 [recognizing abolition of diminished capacity defense in California].) To the extent he is arguing a diminished actuality defense, the instructions quoted above constituted a full and correct statement of that doctrine. (*Id.* at pp. 1116-1117.) Nelson contends that abolition of the diminished capacity defense did not "foreclose[] a voluntary manslaughter instruction based on mental illness." But "the elimination of the diminished capacity defense effectively eliminated the middle option of voluntary manslaughter in a diminished actuality case." (*People v. Wright* (2005) 35 Cal.4th 964, 979, italics omitted.)

## N.     Request for a Competency Hearing

Nelson contends that the trial court's failure to conduct a hearing under section 1368 to determine his competence to stand trial deprived him of his rights to "due process of law, a fair trial, trial by jury, confrontation and cross-examination, effective assistance of counsel, equal protection and a reliable penalty verdict as guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." We conclude the trial court correctly determined there was insufficient evidence to require a section 1368 competency hearing.

51

### 1. Background

On May 10, 1995, approximately six weeks before the scheduled penalty phase retrial, Nelson's trial counsel requested a section 1368 competency hearing, indicating his belief that Nelson "is mentally incompetent." A declaration attached to the motion claimed that Nelson had "exhibited physical signs of emotional trauma," was "suspicious" of counsel, showed "signs of gross paranoia," and "refus[ed] to cooperate with the entire defense team." Counsel added that the court-appointed psychiatrist, Dr. Michael B. Coburn, believed Nelson was "exhibiting signs of psychiatric disorder and [was] unable to cooperate with counsel in trying to save his life."

The trial court held a preliminary hearing to determine whether a competency proceeding was required. Dr. Coburn testified that Nelson was refusing to cooperate with him and opined that his refusal was based on "a suicidal motive or a depressive related motive." Dr. Coburn expressed "doubt" that Nelson was competent "to make decisions" as to whether he would cooperate in any testing or evaluation Dr. Coburn wanted to initiate. Dr. Coburn never saw evidence of psychosis but stated that Nelson's severe "depression or anxiety" caused him to be unable to cooperate with any investigation into his mental state at the time of the offenses and the factors that may have influenced his commission of them. Dr. Coburn was uncertain whether some recent event had caused this inability.

Noting that it was relatively rare for someone to stop cooperating before the penalty phase, Dr. Coburn testified he had seen it happen when someone decided to accept the death process without argument "because they [were] aware of their own behavioral problems and emptiness." He admitted Nelson may have made

52

that decision, although he doubted that was so because Nelson did not have a long criminal history or a diagnosis of being a psychopath.

On cross-examination, Dr. Coburn testified that the first time he met with Nelson at the county jail on February 24, 1995, Nelson told him he hated doctors but would not discuss why and that he "want[ed] the death penalty." Dr. Coburn explained what could happen if Nelson were found not to be competent and brought up other cases he had worked on. Nelson did not communicate further, and Dr. Coburn ended the interview.

At their second interview, Dr. Coburn and Nelson talked about Nelson's lack of recent contact with his family. Dr. Coburn felt that some "rapport" was developing with Nelson, but Nelson still refused to engage in any discussion that "approached emotions," or involved details of either the offenses or his personal history. Nelson mentioned "not wanting to feel anything, not wanting to experience anything, not caring." Nelson was "respectful, quiet and polite" and "certainly" understood what was being said. Dr. Coburn saw no indication Nelson was disoriented or could not "speak about things if he chose" to. Dr. Coburn ended the interview when Nelson became silent.

Dr. Coburn had a third meeting with Nelson and Martha Contreras, a paralegal working for defense counsel. In speaking to Contreras, Nelson provided "limited" responses with a "paucity of feelings." But he did seem to understand what was being asked and his responses generally were appropriate. Dr. Coburn did not question Nelson or try to obtain data from him and instead tried to explore with Nelson the practicalities of "volunteer[ing] for the death penalty."

Nelson declined further meetings with Dr. Coburn. Dr. Coburn never gathered a history from Nelson or administered any tests. Nonetheless, it was Dr. Coburn's opinion that Nelson's noncooperation was "more a function of terrible

53

psychological discomfort" than a rational decision to die, although he acknowledged he was unable to reach a definitive conclusion on that question. Nelson's recent refusal to communicate with the defense team also contributed to Dr. Coburn's doubt about Nelson's competence.

The trial court denied the request for a section 1368 hearing, stating, "I have at this point in time no doubt as to Nelson's competency." The court noted that Nelson "apparently has made a decision that he prefers the death penalty." The court found Nelson's refusal to discuss his reasons for that decision did not establish he was incompetent to stand trial.

On June 28, 1995, defense counsel renewed the motion based on his "serious doubt" that Nelson was able to cooperate in his defense and his belief that Nelson was incompetent. He added that Nelson had told the defense team he could not speak because "it hurts."

The court conducted a further hearing at which Dr. Coburn again testified. Dr. Coburn met with Nelson the morning before he testified. He had a "one-way conversation" with Nelson, who remained silent. A female psychologist had had minimal communication with Nelson but was unsuccessful in her attempt to administer any tests. Nelson was talking with paralegal Contreras, but he was not engaging in "substantive conversations" with defense counsel. Coburn had a "suspicion" that did not rise "to a level of reasonable medical certainty" that Nelson was "paranoid" and "volitionally choosing not to speak." Dr. Coburn could not answer whether Nelson's choice not to speak was rational because he did not have the data to reach such a conclusion. Dr Coburn still had "significant doubt" that Nelson's decision to choose death was rational. Dr. Coburn urged the trial court to declare a doubt as to Nelson's competency "given the fact that it's a life versus death situation," conceding that in significantly less serious matters he

would often "allow totally uncooperative [defendants] to proceed and let the chips fall where they may." Dr. Coburn conceded that Nelson was making a choice not to speak. Dr. Coburn also conceded that he could not predict whether Nelson would ever begin talking with his defense team in order to assist in gathering evidence for the penalty retrial.

The trial court again denied the request for a section 1368 hearing, finding that the defense had failed to present substantial evidence suggesting incompetency. The court also expressed its belief that Nelson's refusal to speak to his lawyers reflected an attempt by him to delay the proceedings rather than incompetency.

On July 5, 1995, the date scheduled for the penalty retrial to proceed, defense counsel made one final request for a section 1368 hearing. He stated Nelson continued to refuse to communicate with him and it was his 'good faith belief' Nelson's refusal was "a mental disorder as opposed to a voluntary will." The trial court stated the "issue has been resolved," impliedly denying the request.

*2. Analysis*

"Trial of an incompetent defendant violates the due process clause of the Fourteenth Amendment to the United States Constitution (*Godinez v. Moran* (1993) 509 U.S. 389, 396) and article I, section 15 of the California Constitution." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1281.) "California law reflects those constitutional requirements. Section 1368, in subdivision (a), requires a trial judge to suspend criminal proceedings at any time 'prior to judgment' if the court reasonably doubts 'the mental competence of the defendant.' A defendant can create reasonable doubt through substantial evidence of mental incompetence, or the trial court can raise the issue on its own." (*People v. Ary* (2011) 51 Cal.4th 510, 517; see § 1368, subds. (a) & (b).)

55

"Evidence is not substantial enough to mandate a mental competence hearing unless it raises a reasonable doubt on the issue. [Citation.] We have said that this standard is satisfied if at least one expert who is competent to render such an opinion, and who has had a sufficient opportunity to conduct an examination, testifies under oath with particularity that, because of mental illness, the accused is incapable of understanding the proceedings or assisting in his defense." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047.) However, " '[m]ore is required to raise a doubt [as to a defendant's competence] than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation].' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 431.) Moreover, "a defendant's preference for the death penalty and overall death wish does not alone amount to substantial evidence of incompetence or evidence requiring the court to order an independent psychiatric evaluation." (*People v. Ramos* (2004) 34 Cal.4th 494, 509.) "[A]bsent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial. [Citation.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1033.)

The only evidence presented by the defense was the testimony of Dr. Coburn and comments from defense counsel that Nelson was not cooperating with counsel. Dr. Coburn testified regarding Nelson's ability to understand the nature of the trial proceedings and to assist his attorney. Dr. Coburn did not see any evidence of psychosis, active delusions, or hallucinations in Nelson. Rather, Dr. Coburn acknowledged that Nelson seemed to understand him during the two hours

that they had spent together and merely reported his "suspicion" that Nelson was "volitionally choosing not to speak." Dr. Coburn testified Nelson told him he did not want to speak to him because he did not like doctors and he wanted the death penalty. Dr. Coburn also testified that Nelson had less trouble speaking to Martha Contreras, a paralegal in defense counsel's office. Nelson responded to her questions, he seemed to understand what was being asked, and his responses generally were appropriate. Dr. Coburn was not able to state with any medical certainty that any psychological disorder was causing Nelson not to speak to him.

The record does not persuasively show that because of mental illness, Nelson was incapable of understanding the nature of the proceedings or unable (as opposed to unwilling) to assist counsel. The crux of Dr. Coburn's testimony as well as defense counsel's concern was that defendant was not communicating with the defense team, an act that appeared to be volitional, potentially reflecting defendant's decision not to contest the death penalty. Dr. Coburn opined those decisions might have been the product of a mental disorder, but he ultimately acknowledged he could not determine whether they were rational. On this record, we are unable to conclude, applying a deferential standard of review, that the trial court erred by denying Nelson's motions to conduct a section 1368 hearing.

## III.  PENALTY PHASE ISSUES

Nelson contends that the trial court's investigation into the penalty phase retrial jury's announced deadlock was so intrusive that it prejudicially invaded the sanctity of deliberations and created a coercive effect on those deliberations. As set forth below, the manner in which the trial court invaded the deliberative process after the retrial jury announced its deadlock is unique and egregious. We reverse the penalty phase judgment.

57

## A. Background

The first penalty phase trial ended in a mistrial after the jury hung 11 to 1. The record does not reveal which of the two penalty options the majority favored. The penalty phase was retried before a new jury. The retrial jury began its deliberations on the afternoon of Tuesday, August 1, 1995 (all dates regarding the retrial deliberations are in 1995). On August 10, after six court days of deliberation, the jury sent word that it appeared to be deadlocked. The jury reported it had taken four votes during deliberations which it tallied as follows: " 1) 7–3–2  [¶]  2) 9–2–1  [¶]  3) 9–3  [¶]  4) 10–2."

Out of the presence of the jurors, the trial court opined that the jurors appeared to be making progress but that it was unclear when during the deliberations the votes had been taken. Defense counsel asked the court to limit its inquiry to the dates of when the votes had been taken and whether further deliberation would accomplish anything. The prosecutor asked the court to order the jurors to take the evening off to think about whether anything might help them reach a verdict. Defense counsel again asked the court to be "restrictive" in its inquiry and to avoid an "exchange between the jurors and the court." The court commented it did not know if the jurors' "problem is with the facts or . . . a philosophical difference" or if they had "gone off on [a] tangent."

The foreperson was then summoned and reported that the four ballots had been taken during the prior week. He agreed with the court's observation that some progress had been made but also said further deliberations would not serve any useful purpose because some jurors had indicated "there is no more changing their mind[s]." Although the trial court acknowledged "[h]aving been out as long as you have, I'm certain you have discussed it at great length," it nonetheless ordered the jurors to return the next morning.

The next day, while the jurors were deliberating, the prosecutor proposed giving them a questionnaire he had drafted that asked the following questions:

"1. Do you believe that there is any reasonable likelihood that further deliberations will result in a unanimous verdict? [¶] 2. Do you feel that there is any clarification of the jury instructions or your duties as jurors [that] would assist you in arriving at a unanimous verdict? [¶] 3. Do you feel that the read back of the testimony of any witness or witnesses or portion thereof would assist you in arriving at a unanimous verdict? [¶] 4. Have any of the jurors refused to deliberate? That includes a refusal to be involved in the discussion and reasoning process. [¶] 5. Has any juror based their present position on cases, information, or influence from <u>any</u> outside sources? That is, anything other than the evidence received in this courtroom or the jury instructions which I have given you. If so, in what manner has this occurred? [¶] 6. Has any juror expressed the view that the death penalty is inappropriate in this case and based that view on anything other than the evidence and the law presented in this case? If so, what? [¶] 7. Has any juror expressed a view that life without parole is inappropriate in this case and based that view on anything other than the evidence and the law presented in this case? And if so, what? [¶] 8. Is there anything you might suggest that could possibly be done to assist you in achieving a unanimous verdict? If so, what?"

Defense counsel objected to the questionnaire. He argued that the only appropriate question was the first one and that the remaining questions improperly asked the jury "how" it had been deliberating, invading the province of the jury and constituting "intimidation." He specifically objected to the questionnaire's repeated attempts to pressure the jury to reach a "unanimous" verdict. He also challenged those questions geared toward uncovering juror misconduct in the

absence of any evidence of such misconduct. Nonetheless, the trial court agreed to give the questionnaire to the jury. Before doing so, the court learned that a fifth vote had been taken that morning and the jury remained deadlocked 10 to 2.

The questionnaires were distributed. The jurors were instructed to put their names on their questionnaires and told they could add any explanations to their yes or no answers.

After the questionnaires were completed and read by counsel, the prosecutor requested follow-up questioning of each juror. He argued that the responses showed one or more of the jurors was not deliberating and that "false or misleading" information "may" have been provided in some jurors' pretrial questionnaires or in voir dire. Defense counsel objected. He argued that the process the prosecutor suggested "is far beyond the scope of this court's authority and should not invade the province of the jury. And I think at this point we have, in essence, done that by soliciting these responses from these jurors."

The trial court stated that the questionnaires indicated all but two jurors believed that further deliberations would not result in a unanimous verdict. The court observed that the two holdout jurors "obviously" are "completely out of touch with the other ten," and "I don't know that anything that we can say or do is going to remedy that. So I think, basically, we have answered our fundamentally underlying question . . . whether or not further deliberations will result in a verdict. And I think the answer to that is probably clearly no."

Nonetheless, the prosecutor asserted that the questionnaires showed that two holdout jurors were not deliberating and "they are shutting everybody else out." He cited one response that said of one of the holdout jurors, " 'The juror gets very defensive, just shuts you out if she doesn't like what she hears, she just stated she can't argue her decision of life because the rest of us don't understand

her decision is final—' " The court interrupted the prosecutor, stating, "Well, I take that to mean that she doesn't intend to change." The prosecutor replied there was some indication a juror might be "afraid" to impose the death penalty and that this was a legitimate area for further inquiry by the court. The prosecutor argued it was appropriate for a court to remove a juror during deliberations based on a demonstrable reality the juror was either not deliberating or was bringing extraneous material into the jury room. The trial court replied that its impression from reading the questionnaires was that "the possibility of the holdouts, so to speak, being persuaded otherwise is zero." Defense counsel argued that the jurors "are consistent that they have made up their minds and this jury has reached a deadlock."

Switching gears, the prosecutor cited the questionnaire from Juror J.J. that indicated another juror was on multiple medications, including psychotropic drugs, and carried a weapon. He suggested that the latter juror had concealed this information in her pretrial questionnaire. The trial court recessed the proceedings to give the prosecution an opportunity to provide authority on what to do with the juror allegedly "on drugs" and "how far do you go with inquiry of a jury that appears to be hung."

The following Monday, the defense requested a mistrial based on the jury deadlock. In response, the prosecutor requested an investigation into whether Juror A.H. had misrepresented her health and gun ownership in her pretrial questionnaire, and had refused to deliberate. The court stated that the questionnaire drafted by the prosecutor had "created more problems" than it had solved and that it did not "really see" a refusal to deliberate. The defense renewed its request for a mistrial and objected to additional investigation. The court decided to question each juror individually in camera to determine whether any of

61

the comments in the questionnaires "have any foundation in fact to the point at least to where it would show good cause to excuse a juror." Defense counsel objected to the proposed procedure. Alternatively, defense counsel argued that the process should take place in open court and that questioning should be limited to whether there was evidence of use of medication and a discussion about a weapon. The court noted the objection.

In open court, the court told the jurors and the alternates that the recent questionnaire, "rather than resolving issues," had raised new issues that would need to be resolved. The court explained, "What I intend to do is to discuss some of the issues one at a time with each one of the jurors. [¶] Let me indicate to you that I am not inferring by this that anybody has done anything wrong."

The court began its questioning of the jurors with the foreperson, but rather than asking him about his responses to the questionnaire, the court read and asked him about other jurors' responses and their thought processes. For example, after the foreperson indicated there never had been a time during deliberations when a juror "refused to deliberate," the court read portions of Juror L.A.'s questionnaire on that topic. Juror L.A. had asserted that another juror's " '[l]ogic process seems to be very faulty.' " Juror L.A. also reported that " '[t]his particular juror . . . refuses to continue talking and restates her position.' " The court read another response in which Juror L.A. indicated one or more jurors had based their present position on "their life experience" rather than solely on the evidence and jury instructions. The foreperson clarified that one juror once related something that happened in his or her life, but "[j]ust as an example, not as a reason" for his or her position.

The trial court told the foreperson another juror had answered "Yes" to the question whether any juror had based his or her view that the death penalty was

inappropriate on anything other than the evidence and the law. The foreperson said that "early on" one person had been confused on "what [evidence] was presented" but was no longer confused.

The court read the following response from Juror M.B. to the foreperson: "It says, 'After the first vote, one juror had made up their mind. She would continue to deliberate but would not change her mind.' " The court commented, "I don't know whether that's necessarily refusing to deliberate." In response, the foreperson stated that there were "a couple of jurors who said that they had — after the first balloting, that their opinions and decisions were strong but not in stone." In response to more probing by the court, the foreperson said those jurors continued to deliberate and argue their positions.

The court continued in this vein — reading responses from other jurors and asking the foreperson about them and interjecting its own opinions about the responses. For example, it read a response in which a juror expressed the view that the death penalty was not appropriate because "Sergio Nelson doesn't have a history of murders, so he must not be a murderer. He had a bad day and committed a crime." The court opined, "That's putting it, you know, rather simply," and asked, "Is that the position of some of the jurors or a juror?" The foreperson responded that the quoted response was "making light of a position of a juror to try to explain their reasoning and their position," and that the response "was not a fair statement as to what exactly they were trying to bring across." The court then told the foreperson, "Well, it infers the two murders were insufficient." The foreperson answered, "Yeah. And I don't believe that was the case." The court then asked, "So that was not a strongly held position by anyone?" The foreperson answered, "No."

The court then discussed the question whether anything might assist the jury in achieving a unanimous verdict. It read the same juror's response to the foreperson: "And the answer is, 'You can dismiss two jurors who are not fair to both sides and are unreasonable in thinking. They lack common sense and are more responsive to their feelings instead of the law.' " When the trial court commented, "I assume that that's also kind of a tongue-in-cheek answer," the foreperson agreed.

Based on a comment in one of the questionnaires that a juror was "on multiple medications and psychotropic drugs," and "carries a weapon," the court asked the foreperson if any juror "has problems with medications of some sort that might affect their decision-making process?" The foreman answered, "That would affect their decision-making process, no. There is a juror who has related that they had to take medication, but nothing has indicated that it's affected their decision-making process." In response to further questions from the court, the foreperson said that he had not seen any "medications or psychotropic drugs," he had no indication what the drugs were for, and he had seen no outward influence or appearance from them.

The court next asked, "How about carrying a weapon?" The foreman said the juror did not have a weapon in the jury room nor did the juror carry a weapon because the juror "enjoy[s] weapons" but because the juror's place of employment encouraged the carrying of a weapon "for protection."

The court asked the foreperson about criticisms of the holdout jurors by other jurors. For example, the court asked the foreperson whether "two of our jurors are of the opinion that even though the aggravating circumstances or aggravating factors are overwhelming, even under those conditions, they could not vote for death?" The foreperson responded, "No, that's not the case." He

64

explained that, in the opinion of the holdouts, "the aggravating factors were not compelling. They found the mitigating factors to be compelling." The court then asked, "The aggravating factors were not sufficiently compelling?" The foreperson replied, "Not sufficiently compelling." After reading a comment by a juror that one of the holdouts " gets very defensive" and has stated "her decision is final,' " the court asked, "Does that indicate to you that they would not deliberate or that they would deliberate but were rock solid in their position?" The foreperson replied the juror "would deliberate."

The court then read a juror's response regarding what might assist the jury in achieving a unanimous verdict. "And it says, 'Anything short of getting the two people opposing to validate — I guess they mean invalidate — their position or give reasoning with the law. I don't think anything will help.' " The court asked the foreperson, "Would you say that's probably a good analysis of your position?" The foreperson answered, "Crude, but, yes."

Defense counsel declined to question the foreperson. The prosecutor, however, asked about a juror having a weapon. The foreperson said the juror had been encouraged by law enforcement to carry a small weapon that fit in her purse for security at her work. He added that the issue was briefly discussed apparently in connection with why defendant would have carried a weapon but "never brought up again." The prosecutor asked about that juror's use of medications. The foreperson said the juror had volunteered that she saw a therapist and that the medication helped her to deal with work and life issues. Under further questioning, the foreperson identified this juror as Juror A.H. and acknowledged that she was one of the holdout jurors.

In response to questioning from defense counsel, the foreperson clarified that the juror's carrying a weapon was "past tense." He said the juror had

volunteered that she currently was taking medication. He added, "if she had not said anything, there was no way for us to know."

The foreperson was excused and told not to speak to the other jurors about what he had been asked.

Over a defense objection, the court next questioned Juror J.J. about her comments regarding Juror A.H., including the latter's use of medication and her ownership of a gun. The court first asked J.J. about her answer to the question regarding whether anyone had refused to be involved in the discussion and reasoning process. J.J. said no one had refused to deliberate, but that one juror, after initially discussing the case, soon indicated her position was unchangeable. Asked both by the court and by defense counsel if that juror had explained her reasoning process, J.J. said the juror stated that something was wrong with Nelson's mind and that he "really didn't mean this" and was not a murderer. J.J. said this was the same juror who was taking several medications, including lithium. Juror J.J. added that she is a nurse and it was her professional opinion that the juror's behavior indicated she was taking lithium. She described the juror as withdrawn and unable to speak in complete sentences. J.J. identified the juror as A.H., who, she said, was the same juror who carried a weapon.

Juror A.H. was summoned into chambers for questioning. Before she arrived, defense counsel renewed his objection that "the province of the jury" was being invaded. The court overruled the objection, stating that, based in part on what it had learned from its questioning of the foreperson and Juror J.J., it intended to explore whether Juror A.H. had misstated information on the questionnaire she originally had completed in anticipation of voir dire. Defense counsel then argued that the court should question all the other jurors who had not reported a refusal to deliberate.

66

When Juror A.H. arrived, she was questioned about whether the jury had discussed carrying a gun for protection and what that discussion entailed. A.H. said the jury had discussed that some individuals who carry weapons are not "going to commit murder," and she mentioned the jurors "would be surprised" about who was told to carry a gun or "why people carry guns." She acknowledged she owned a revolver but said she had not mentioned it in her original questionnaire because she did not think about it. She added, "I did not intentionally answer it wrong." She said the revolver was "stored away" and could not recall the last time she had looked at it but that it had probably been five or six years earlier.

Regarding her use of medications, Juror A.H. said that besides taking medicine for stomach problems — something she had disclosed on her originally questionnaire — she had been diagnosed as "bipolar" and took Wellbutrin and lithium for that condition. She said she had taken this medication for a long time and it neither clouded her thinking nor hampered her analytical skills. She added she functioned at a "very high, high level," had received her "BS and Masters at the same time," and had worked in managerial positions at the Department of Motor Vehicles for 17 years. On another subject, A.H. acknowledged she knew three individuals who had been in custody.

After Juror A.H. was excused, the prosecutor argued that she should be dismissed from the jury because of her misstatements on the original questionnaire. The court agreed and said it would remove Juror A.H. because of the intentional "misrepresentation" on her original questionnaire.

Defense counsel moved for a mistrial, arguing that the trial court had invaded the province of the jury and that the jurors who had been questioned "cannot deliberate independent of the process that we have begun this morning"

67

because they "have been contaminated." The trial court denied the motion for mistrial and relieved Juror A.H. based on its finding that "there was an intentional misrepresentation" on her original questionnaire regarding her revolver, her health problems, and her acquaintance with individuals who had been in custody.

Thereafter, the remaining jurors and the alternate jurors were brought into court and told that A.H. had been excused. An alternate juror was seated. The court instructed the reconstituted jury that it was required to start deliberations anew, but "because you only have one additional juror . . . , perhaps, you collectively can bring him up to speed and in the process cover what it is that you have covered previously." The jury deliberated the rest of that afternoon with one recess and adjourned at 4:00 p.m. The next day it deliberated for approximately two and a half hours before reaching a verdict. The verdict fixed the penalty at death.

### B. Analysis

The Sixth Amendment mandates, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." Given that one rationale for a jury trial "is to prevent oppression by the Government[,] . . . the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." (*Williams v. Florida* (1970) 399 U.S. 78, 100.) Central to the achievement of that civic goal is the requirement that jury deliberations be conducted in secret. (*U. S. v. Thomas* (2d Cir. 1997) 116 F.3d 606, 618 [secrecy of deliberations is the cornerstone of the modern Anglo-American jury system].) Accordingly, the Supreme Court has emphasized that a jury's deliberations must be "free from

outside attempts at intimidation." (*Williams v. Florida supra*, 399 U.S. at p. 100.) This admonition applies to the trial court itself: "Courts must exercise care when intruding into the deliberative process to ensure that the secrecy, as well as the sanctity, of the deliberative process is maintained." (*People v. Russell* (2010) 50 Cal.4th 1228, 1251.)

Our state Constitution independently declares that "[t]rial by jury is an inviolate right and shall be secured to all . . . ." (Cal. Const., art. I, § 16.) We similarly have emphasized that the federal and state constitutional right to a trial by an impartial jury includes the right to a jury "in which no member has been improperly influenced" and that protecting a jury's impartiality " 'assures the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes.' " (*In re Hamilton* (1999) 20 Cal.4th 273, 294 & fn. 17.)

In *People v. Engelman* (2002) 28 Cal.4th 436 (*Engelman*), we disapproved of a jury instruction stating in part that " 'should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.' " (*Id.* at p. 442.) We observed that "an important element of trial by jury is the conduct of deliberation in secret, free from ' " 'intrusive inquiry into the sanctity of jurors' thought processes.' [Citation.]" ' Secrecy affords jurors the freedom to engage in frank discussions, free from fear of exposure to the parties, to other participants in the trial, and to the public. [Citations.] The mental processes of deliberating jurors are protected, because '[j]urors may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny. *The very act of questioning deliberating jurors about*

69

*the content of their deliberations could affect those deliberations.* The danger is increased if the attorneys for the parties are permitted to question individual jurors in the midst of deliberations.' [Citation.]" (*Id.* at pp. 442-443., italics added.)

We recognized that the secrecy of deliberations "may give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct." (*Engelman*, *supra*, 28 Cal.4th at p. 443, italics omitted.) Even then, however, trial courts "must exercise care in responding to an allegation from a deliberating jury that one of their number is refusing to follow the court's instructions or is refusing to deliberate" or is engaging in any form of juror misconduct. (*Id.* p. 445.)

In this case, the trial court's inquiry was not triggered by an indication or allegation of juror misconduct. Rather, the triggering event was that the jury reported itself to be at an impasse after several days of deliberation. In such circumstances, the trial court may take certain actions. For example, current California Rules of Court, rule 2.1036(a), adopted in 2007, states that where an impasse has been reported, "the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask if the jury has specific concerns which, if resolved, might assist the jury in reaching a verdict." Rule 2.1036(b) states, "[i]f the trial judge determines that further action might assist the jury in reaching a verdict, the judge may: [¶] (1) Give additional instructions; [¶] (2) Clarify previous instructions; [¶] (3) Permit attorneys to make additional closing arguments; or [¶] (4) Employ any combination of these measures."

Thus, a trial court may intervene in jury deliberations where it receives reports of juror misconduct or in response to an impasse, but such interventions

must be limited and undertaken with the utmost respect for the sanctity of the deliberative process. In this case, the trial court went considerably beyond any permissible intervention and took action that undermined the sanctity of jury deliberations and invaded the jurors' mental processes. Based solely on the reported impasse, the court subjected the jurors to a detailed questionnaire that asked them to report on the thoughts and conduct of their fellow jurors — specifically, whether the jurors were refusing to deliberate, whether they were basing their position on anything other than the evidence and jury instructions, and whether they were expressing views about the inappropriateness of the death penalty or life without parole based on anything other than evidence and law. It was clear to the jury that the purpose of this inquiry was to solve the problem of the jury's deadlock, and the inquiry therefore communicated to holdout jurors that their deliberative processes would be reported by fellow jurors and scrutinized by the court. This was improper. " ' "As a general rule, no one — including the judge presiding at a trial — has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror." ' " (*Engelman*, *supra*, 28 Cal.4th at p. 443.)

This case is factually distinguishable from *People v. Sheldon* (1989) 48 Cal.3d 935 (*Sheldon*), relied on by the Attorney General. In *Sheldon*, the jury's foreman informed the trial court that the jury was hopelessly deadlocked 11 to 1 in favor of death after two days of deliberation and with one ballot having been taken. Upon questioning by the court, however, several jurors, while confirming the deadlock, "expressed the hope that further instructions by the court might assist in bring about a verdict." (*Id.* at p. 958.) The court announced its intention to reread the penalty phase instructions the following morning. Before it could so, the defendant moved for a mistrial on the grounds that forcing the jury to resume

71

deliberations after it announced the vote "would be the equivalent of directing a death verdict." (*Ibid.*) The trial court denied the motion and reread the instructions. After further deliberations, the jury returned a verdict of death. The defendant moved for a new trial, asserting the trial court had coerced the verdict. That motion, too, was denied. (*Id.* at pp. 958-959.)

On appeal, we also rejected the jury coercion claim: "No improper coercion occurred here. The trial court made no coercive remarks and exerted no undue pressure on the minority juror to change his vote. [Citation.] The court merely made a discretionary determination, based on its examination of the jury, that there remained a reasonable probability the deadlock might be broken following a rereading of the penalty instructions. This determination seems entirely reasonable given the fact that, before announcing the deadlock, the jury had deliberated for only two days and had taken only one ballot, and that several jurors had indicated that such a reinstruction might produce a unanimous verdict." (*Sheldon, supra,* 48 Cal.3d at p. 959.) The intrusive actions by the trial court in this case and the resulting pressure placed on jury bear no resemblance to the reasonable actions taken by the trial court in *Sheldon*. Thus, *Sheldon* is inapposite.

We conclude that the trial court erred in giving the questionnaire to the jurors and in questioning several jurors about their responses. We turn then to the question of prejudice. Nelson contends this unconstitutional intrusion into the deliberative process constitutes structural error that requires automatic reversal under the federal Constitution. We have recognized that not every unwarranted intrusion into a jury's deliberative process requires automatic reversal. (See, e.g., *People v. Jennings* (1991) 53 Cal.3d 334, 383-384 [court's ex parte communication with jury harmless beyond a reasonable doubt because its admonition was a correct statement of law, it gave parties notice of its misstep,

72

and it sought counsel's suggestions for an appropriate additional admonition].)

Here, assuming that the trial court's intrusions into the deliberative process do not constitute structural error and are instead subject to harmless error analysis, we conclude the intrusions were not harmless because they amounted to jury coercion.

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24.) Our state standard of review of state constitutional errors in the penalty phase of a capital trial — "whether there is a reasonable possibility the error affected the verdict" — parallels the *Chapman* standard. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960-961 [the two standards are " 'the same in substance and effect' " (citing *People v. Ashmus* (1991) 54 Cal.3d 932, 990].) Under both state and federal law, "[a] defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. [Citations.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) A verdict " ' "cannot stand if even a single juror has been improperly influenced." ' " (*Ibid.*) "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case. [Citations.]" (*People v. Pride* (1992) 3 Cal.4th 195, 265.)

In the circumstances of this case, we conclude there is a reasonable possibility that the unwarranted introduction into the jury room of the court-authorized questionnaire and the court's subsequent questioning of the jurors affected the jury's deliberations. As we have recognized, inquiries by the trial court designed to disclose the jury's deliberative processes are " ' "[e]specially troublesome" because of "the danger that such disclosure . . . presents to the operation of the deliberative process itself." ' " (*Engelman*, *supra*, 28 Cal.4th at p. 443.) " ' "[T]he mere suggestion that the views of jurors may be conveyed to

73

the parties . . . understandably may cause anxiety and fear in jurors, and distort the process by which a verdict is reached . . . ." ' " (*Ibid.*)

Here, there was more than a remote possibility that the questionnaire and the trial court's follow-up questioning distorted the deliberative process, communicating to the jury that the views of the minority jurors preventing the achievement of unanimity would be reported by the other jurors and would be subject to scrutiny by the trial court in the form of questions such as whether "there is anything you might suggest that could possibly be done to assist you in achieving a unanimous verdict? If so, what?" There is a reasonable possibility that this inquiry into jurors' views would discourage jurors from taking or maintaining the minority position.

Adding to the pressure on the jurors was the trial court's excusal of Juror A.H. Although the trial court has a duty under section 1089 to remove jurors when it becomes aware they are unable to perform their duties, the information that led to the removal of A.H. came to light only when the court improperly gave the questionnaire to the jurors. The questionnaire fostered a selective disclosure process: It was clear that the point of the questionnaire was to expose the conduct and thought processes of the holdout jurors, not jurors in general.

Nelson contends that A.H. was improperly excused, an issue we not need resolve in light of our reversal of the penalty judgment based on the trial court's intrusion into the jury's deliberative process. Nonetheless, we are skeptical that the grounds provided by the trial court for A.H.'s dismissal demonstrated "reasonable grounds for inferring" A.H. was biased as a " 'demonstrable reality.' " (*People v. Price* (1991) 1 Cal.4th 324, 400.)

Regarding her ownership of a gun — a subject of questions Nos. 15 and 34 of the juror questionnaire — A.H. explained that she had forgotten about the gun

74

because it had been in storage for years and she had not seen it in five or six years. As to her bipolar illness, as Nelson points out, the juror questionnaire's phrase of the health question — "Do you have any specific health problems or disabilities?" — could have been understood by her to refer to physical disabilities only, and in fact, the juror answered that she had "digestive problems." Moreover, she disclosed on her questionnaire that she had seen a mental health professional. Finally, as she explained to the court, her bipolar condition was controlled by medication, did not impede her thought process, and had not prevented her from receiving her bachelor's and master's degrees or from working in a managerial position. Thus, not only was it reasonable that A.H. could have understood the question to be asking about physical and not mental disabilities, she may reasonably not have viewed her condition as a disability at all.

On the issue of whether A.H. knew individuals in custody, the question at issue asked, "Have you, or anyone *close* to you, ever been arrested for or accused of a crime?" (Italics added.) On her questionnaire, A.H. disclosed that she had a friend who had outstanding warrants and had apparently been arrested for receiving stolen property. When questioned further during the penalty phase, she acknowledged that her former babysitter's son and her former brother-in-law had also been in custody. The juror may quite reasonably have thought neither of these individuals — an ex-babysitter's son and an ex-brother-in-law — were "close" to her for purposes of having to disclose them in response to the question. In short, it is not evident that the juror affirmatively misrepresented or concealed material information. Her responses appear to be either the result of inadvertence or a reasonable interpretation of the questions asked on the questionnaire. The selective scrutiny to which A.H. was subjected and the dubiousness of the trial

court's grounds for excusing her further highlight the impropriety of the court's unwarranted intrusion into the deliberative process and its coercive effect.

Under the circumstances presented above, there is a reasonable possibility that these intrusions into the jurors' deliberative process suggested to the jurors the following: (1) the majority position was the reasonable one; (2) the dissenting jurors' position was unreasonable and would be subject to particular scrutiny — an inference that could only have been strengthened when the court, without explanation to the jury, excused one of the two holdout jurors; and (3) the "new" deliberations following the substitution of one holdout would simply be a matter of the majority convincing the last holdout and the new juror to come to its side. There is a considerable possibility that this message would have pressured the remaining holdout juror to reevaluate her position and would have discouraged the alternate juror, whose views until that point were unknown, from taking a minority position.

Moreover, to the extent the majority jurors were also continuing to deliberate, and there was a possibility that they too could change their minds in favor of life without parole, the questionnaire and the court's remarks made any such conversion significantly less likely. With respect to the foreperson and Juror J.J, both of whom were questioned by the trial court about the holdout jurors, there is a reasonable possibility that the trial court's direct questioning led them to believe that a change in their position in favor of life without parole, thereby deepening the impasse, would result in the trial court again asking them to account for their own or other jurors' thought processes. In addition, there is a reasonable possibility that other jurors were aware of the trial court's questioning of the foreperson and Juror J.J., leading them also to believe they might have to explain their thought processes to the court if they voted for life without parole.

76

In sum, we cannot conclude beyond a reasonable doubt that the death verdict in this case was the product of fair and impartial deliberations free from the intrusive influence of the trial court's questions and comments. We conclude Nelson is entitled to a new penalty trial.

## IV.  CONCLUSION

For the reasons above, we reverse the lying-in-wait special-circumstance and penalty judgment, and otherwise affirm the convictions.


**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**CONCURRING AND DISSENTING OPINION BY CORRIGAN, J.**

I concur in the judgment, but dissent with regard to the lying-in-wait issue. (Maj. opn., *ante*, at pp. 41-45.)  The murder in this case was an ambush, unlike the murder in *People v. Carter* (2005) 36 Cal.4th 1215, the only case on which the majority relies to reach its contrary conclusion.  In *Carter*, the defendant broke through the victim's front door.  (*Id*. at p. 1261.)  Here, defendant snuck up on his victims from behind as they sat unsuspecting in the front seats of a car, and shot them through an open rear passenger window.  These facts are nothing like those in *Carter*.

The majority does not question the sufficiency of the evidence that defendant concealed his purpose and perpetrated a surprise attack on his unsuspecting victims from a position of advantage.  It finds the evidence lacking only as to the "substantial period of watching and waiting" element of the lying-in-wait special circumstance.  (*People v. Morales* (1989) 48 Cal.3d 527, 557.)  It reasons that because the evidence did not establish whether defendant arrived at the scene before his victims, it cannot be said there was a period of watchful waiting.  I disagree.

As the majority recognizes, the period of watching and waiting required for the lying-in-wait special circumstance need be no longer than the time required to form the mental state of premeditation or deliberation.  (Maj. opn., *ante*, at p. 43.)  The majority recounts that defendant rode his bicycle to the parking lot where he

1

had reason to believe the victims would be waiting before work. He concealed his bicycle before approaching the victims from the rear. (*Id*. at pp. 43-44.) We also know from the testimony of an eyewitness that defendant ran away on foot after making sure his victims were dead by returning to the car to shoot several more times. Even if defendant arrived at the parking lot after the victims did, these facts indicate that he took the time to hide his bicycle some distance away from the victims' car.

There is no question that defendant had time to premeditate and deliberate this murder while he went from where he left the bicycle to the car. Surely the majority would not overturn a first degree murder verdict on these facts for insufficient evidence of premeditation or deliberation. Under settled law, recited by the majority and explained to the jury in the special circumstance instructions, "[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." (CALJIC No. 8.81.15 (1989 rev.) (5th ed. 1988) (Special Circumstances — Murder While Lying in Wait); see, e.g., *People v. Mendoza* (2011) 52 Cal.4th 1056, 1073; *People v. Moon* (2005) 37 Cal.4th 1, 23; maj. opn., *ante*, at p. 43.)[1]

---

[1]  The majority does not question our precedent approving this rule. It cites *People v. Sandoval* (2015) 62 Cal.4th 394, 424, for the proposition that "the fact that there was substantial evidence of premeditation and deliberation does not necessarily mean there was substantial evidence of watching and waiting for an opportune time to act." (Maj. opn., *ante*, at p. 45.) *Sandoval*, however, says only that "a conclusion that there was insufficient evidence of lying-in-wait murder does not mean there was no premeditation and deliberation, but only that these mental states must be established by another route." (*Sandoval*, at p. 424.)

Reviewing the record in the light most favorable to the jury's determination, as the majority acknowledges we must, the evidence of watchful waiting was plainly sufficient. (Maj. opn., *ante*, at p. 43.) The jury could reasonably find that after concealing his bicycle, defendant engaged in "a substantial period of watching and waiting for an opportune time to act." (*People v. Morales*, *supra*, 48 Cal.3d at p. 557.) Whether he arrived at the scene first or his victims did, it is inferable that as he approached the car from behind, he was watching the victims for any sign they might discover his presence, and waiting until he was in position to shoot them before they did.

**CORRIGAN, J.**

**I CONCUR:**

**CHIN, J.**

3

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Nelson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S048763
**Date Filed:** August 15, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Clarence Stromwall

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Joseph E. Chabot and Nina Wilder, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Sharon E. Loughner and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joseph E. Chabot
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

Tita Nguyen
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2060