Filed 4/7/25  P. v. Morton CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br><br>     v.<br><br><br>ULYSSES KEYSHAWN MASON MORTON,<br><br>     Defendant and Appellant. | B330864<br><br><br>(Los Angeles County<br>Super. Ct. No. MA083579) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Remanded in part, otherwise affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

In 2023, a jury convicted appellant Ulysses Keyshawn Mason Morton of the 2016 murder of Jaquarius Quinn and of personally using a handgun in the commission of that crime.  At trial, the prosecution proceeded on the theory that appellant killed Quinn for revenge, because appellant believed that Quinn's sister was involved in the murder of appellant's friend.

Appellant appeals from his conviction.  He contends the court erred by failing to instruct the jury on the lesser included offense of voluntary manslaughter.  He also argues that his counsel was ineffective for failing to request a limiting instruction on gang-related testimony.  Finally, he contends that the trial court erred in imposing the sentence on the firearm enhancement, an error that respondent Attorney General concedes requires remand.  We conclude that appellant has not established any prejudicial error with respect to the jury instructions. We therefore affirm appellant's conviction and remand for resentencing on the firearm enhancement.

## PROCEDURAL HISTORY

On October 6, 2022, appellant was charged by information with one count of murder (Pen. Code, § 187, subd. (a)).[1]  The information further alleged appellant personally used a handgun in the commission of the offense.  (§ 12022.5, subd. (a).)

Appellant's jury trial began on April 19, 2023.  On April 26, the jury found appellant guilty of second degree murder and found true the personal firearm use allegation.

The court sentenced appellant to 15 years to life in prison for the murder, plus a consecutive 10-year sentence for the firearm enhancement. Appellant timely appealed.

## FACTUAL BACKGROUND

I.  **Prosecution Evidence**

A.  *Diddy Fennell's death*

The prosecution presented evidence related to an earlier death, that of Diddy Fennell, as it was relevant to the alleged motive for Quinn's murder. Quinn's grandmother testified that in the summer of 2016, Quinn's sister,

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

Jaquinta Cole, moved from Palmdale, California to North Carolina with her daughter, J., and her boyfriend, Fennell. Fennell was killed in North Carolina on October 31, 2016. Fennell's friends suspected that Cole was involved in his murder.[2] Following Fennell's death, Cole and her family received death threats on Facebook. Appellant sent several Facebook messages to friends on November 1 and 3, 2016 discussing how upset he was by Fennell's death and the rumor that Cole was involved in the murder.

At the time, Cole's brother, 17-year-old Jaquarius Quinn, was living with his grandmother in Palmdale. On November 1, 2016, Jahad "Danger Blue" Bordenave, upset about Fennell's murder, sent threatening Facebook messages to Quinn. Bordenave also sent a Facebook post to Cole that he was "going to mirk [kill] everyone in your family."

### B. *Quinn's murder*

Jawnie Sellers testified that on November 6, 2016, she and her friend, Tina Thomas,[3] were at Courson Park in Palmdale for a candlelight vigil for Fennell. According to Sellers, "everybody" at the vigil was saying that Cole was involved in Fennell's death. Sellers had spoken to appellant earlier that day through Facebook messages about selling plates of food at the vigil to fundraise for Fennell's family. Appellant approached her at the vigil and asked for a ride to his brother's house.

Sellers agreed to give appellant a ride and she, Thomas, and appellant left the vigil in Sellers's green Ford Focus. When they arrived at appellant's brother's house, appellant went inside briefly, then came back out and said he wanted to go smoke with Quinn. Sellers did not know Quinn, but she had seen him at the vigil and knew he was Cole's brother. As directed by appellant, Sellers drove them to Quinn's house. When they arrived, appellant said his phone was dying and asked to use Thomas's phone to tell Quinn to come outside. Quinn came out about 20 minutes later and got into the rear passenger seat, next to appellant. This was around 8:00 p.m.

Sellers drove the group to a nearby smoke shop. She testified that the drive was "kind of awkward," because no one was talking. She bought some

---

[2] Cole ultimately was convicted as an accessory to Fennell's murder.

[3] Sellers and Thomas testified under a grant of prosecutorial immunity.

supplies, then they all agreed to go to a park to smoke. Sellers acknowledged that she had been drinking alcohol and smoking marijuana that day and was "a little faded." She started to drive down Old Harold Road, heading toward the park. As Sellers was driving, she noticed a flash of chrome in the rear-view mirror. At first she thought it was nothing, but then she saw it again. Turning around, she saw appellant hitting Quinn with a gun in the backseat. She saw appellant hit Quinn at least twice with the gun in the face. Quinn was crying, bleeding, and telling appellant he had nothing to do with it.

Sellers testified that she was driving "like 60-miles-per-hour," but she put her car into park and told appellant to get out. Sellers told Thomas to get out too because appellant "was going to kill [Quinn] in my car." Sellers and Thomas both got out and stood by the driver's door. Appellant told Quinn to get out and they were standing on the other side of the car near the rear passenger door. She heard Quinn begging appellant not to kill him, but appellant turned his head away and shot Quinn.

Sellers, Thomas, and Quinn got back into the car and Sellers complied with Quinn's direction to drive to his grandmother's house. Sellers testified that she complied; she was scared because appellant "had a gun and he just killed . . . his own friend, so what will make me any different?" No one said anything during the drive, but appellant was crying. They went inside appellant's grandmother's house and appellant took a shower. Next appellant told Sellers and Thomas that they were going to the park to burn his clothing. The three of them went to the park and tried to burn appellant's clothing in a metal trash can. They could not get the clothing to fully catch fire and they left when they heard a fire truck arriving. Sellers dropped appellant off at his grandmother's house.

The morning after the shooting, appellant shared with her on Facebook a post discussing a "no witnesses, vehicle versus pedestrian" death that had occurred on Old Harold Road the day before. Sellers also messaged appellant that day, saying "You solid bro?" Appellant responded that he was on the way to the park. Sellers responded, "We went over there. It was nothing." She also told appellant, "no tape," explaining that she had heard from a friend who lived nearby that there was no police tape blocking the area of the

4

crime scene. However, Sellers went to visit this friend herself and saw tape up at the crime scene, which she reported to appellant.

She did not speak to the police about the incident until July 2022, after she was arrested for possession of drugs for sale. She did not go to the police sooner because she was afraid something might happen to her. She abandoned the Ford Focus a few days after the shooting because the axle failed.

During cross-examination, Sellers denied being affiliated with the Rollin 30s West Coast Crips or any other gang, but testified that some of her friends were in the gang. She denied that her nickname "Rolly" had anything to do with the Rollin 30s gang.

Tina Thomas similarly testified to the events following the candlelight vigil on November 6. She stated that she could not remember many details because she was "really intoxicated." She recalled Sellers driving her and appellant to the store and then to pick up Quinn. After Quinn got in the car, they drove toward the park, and she recalled hearing some arguing from the backseat. Then Sellers told her to get out of the car. Everyone got out, then Thomas heard a loud noise. She did not see a gun and did not recall telling detectives that she saw a gun before getting out of the car. Thomas denied seeing appellant shoot anyone. After the loud noise, Thomas, Sellers, and appellant got back in the car and left. She did not recall going back to appellant's house or him showering. Thomas testified that they went directly to the park, where they resumed smoking and drinking. Appellant also told them to burn his clothing in a trash can in the park.

A resident living nearby on Old Harold Road discovered Quinn's body and called 911 around 8:30 p.m. on November 6, 2016. The witness testified that when he arrived, Quinn was still breathing, but could not talk and had a "gruesome" head wound. The autopsy revealed that Quinn sustained a fatal gunshot wound above his left eye. Quinn also had several abrasions on his face. The bullet fragments removed from Quinn's head were either a .38 or a .357 magnum caliber, which are typically fired from a revolver.

C. *Investigation*

Deputies from the Los Angeles Sheriff's Department (LASD), responded to the 911 call. They found a marijuana canister and two cigars at

the scene, which Sellers later identified as hers and contained her fingerprints.  The following day, Quinn's grandmother identified Quinn's body.

LASD investigators initially spoke to Bordenave because of his Facebook messages threatening Quinn and his family, but they ultimately ruled out Bordenave as a suspect in Quinn's murder.  Based on other Facebook posts, the investigators determined that Sellers was involved in the shooting, but were unable to find her until her arrest in 2022 on an unrelated charge.  LASD deputies then arrested appellant in July 2022.

The prosecutor also played recordings of phone calls appellant made from jail immediately after his arrest.  In those calls, appellant referenced both Thomas and Sellers, even though LASD had not named either individual as a witness in discovery up to that point.

## II.    Defense Evidence

Appellant presented no affirmative evidence.

## DISCUSSION

## I.    Voluntary Manslaughter Instruction

Appellant contends the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of voluntary manslaughter because there was evidence that he could have killed Quinn in the heat of passion.  We conclude that there was insufficient evidence to support a voluntary manslaughter instruction and thus there was no error.

### A.    *Legal framework*

#### 1.    *Instruction on lesser included offenses*

"A criminal defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right.  To protect this right . . ., a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present."  (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) "'Substantial evidence' in this context is 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' that the lesser offense,

but not the greater, was committed." (*Ibid.*; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162, overruled on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)

On appeal, "[w]e review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant [citations]." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

2.    *Voluntary Manslaughter*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "'Manslaughter is the unlawful killing of a human being without malice.' Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter. Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*People v. Nelson* (2016) 1 Cal.5th 513, 538, quoting § 192, subd. (a).)

"The fundamental inquiry when examining heat of passion in the context of manslaughter "'is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary [people] of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."'" (*People v. Nelson, supra*, 1 Cal.5th at p. 538, quoting *People v. Beltran* (2013) 56 Cal.4th 935, 948 (*Beltran*).) "Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly." (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*), citing *People v. Moye* (2009) 47 Cal.4th 537, 549–550.) "The provocative conduct by the victim may be physical or verbal," but must meet the objective person standard. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) Thus, our Supreme Court has "rejected arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (*Enraca, supra*, 53 Cal.4th at p. 759, citing *People v. Avila* (2009) 46 Cal.4th 680, 706–707; see also *People v. Manriquez* (2005) 37 Cal.4th 547, 586.)

7

"Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.'" (*Enraca, supra*, 53 Cal.4th at p. 759.)

B. *Analysis*

Appellant was charged with murder and the jury was instructed on first and second degree murder, but not lesser included offenses. His counsel did not request any instructions, but he contends the court had a sua sponte duty to instruct the jury on voluntary manslaughter. We are not persuaded.

Appellant contends a heat of passion instruction was warranted based on evidence that he had an argument with Quinn in the car and that Quinn stated he had nothing to do with Fennell's murder. Sellers testified that the circumstances leading up to the shooting included appellant hitting Quinn in the head with his gun, while Quinn cried out in pain and said he had nothing to do with it (presumably referring to Fennell's murder), then begged for his life before appellant shot him. Thomas, who admitted to being intoxicated at the time, testified that she thought she heard appellant and Quinn arguing in the backseat, but provided no details about the argument and no other basis for the jury to conclude that a reasonable person would have been provoked to act rashly in response to Quinn's statements. (See *People v. Manriquez, supra,* 37 Cal.4th at p. 586 [insufficient provocation where victim "approached defendant and 'started offending him,' called defendant 'a mother fucker,' asking defendant whether he had a gun and daring him to use it"].) Moreover, as respondent points out, to the extent appellant argues that Quinn's denial of responsibility for Fennell's murder caused appellant to react rashly, "a passion for revenge cannot satisfy the objective requirement for provocation." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 301, citing *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.)

Thus, there was no basis to instruct on the lesser included offense of voluntary manslaughter based on a theory of heat of passion because the evidence did not support giving the instruction.

II. **Ineffective Assistance of Counsel**

Appellant next contends that his counsel was ineffective for failing to object to evidence of gang affiliation elicited by the prosecution or to request a limiting instruction. We disagree.

8

## A. *Gang Evidence*

Appellant points primarily to evidence presented by the prosecution "that appellant and his brother were members of the Rollin 30's gang." However, the first evidence at trial of any gang affiliation was elicited by the defense, during cross examination of Sellers. Sellers denied affiliation with any gang but testified that she had friends in the Rollin 30s West Coast Crips. Defense counsel also introduced a Facebook message suggesting that appellant shot Quinn for "clout." During the re-direct examination of Sellers, the prosecution asked whether appellant was a gang member. Sellers replied that she did not know, but that appellant and his brother "claimed" association with the Rollin 30s gang.

Similarly, the prosecution elicited evidence that Bordenave used the Facebook name "Danger Blue," was present at the candlelight vigil for Fennell, and had sent threatening Facebook messages to Quinn because he was upset over Fennell's death. But the gang-related testimony regarding Bordenave was presented during the defense's cross-examination of an LASD investigator. *Defense* counsel elicited testimony that Bordenave had a tattoo of a Rolls Royce logo on his neck, a logo sometimes used by Rollin 30s members. Defense counsel also questioned the LASD investigator regarding the nickname "Bopkilla" for Fennell's brother. The investigator testified that "BOP" stands for Blood on Point, an Antelope Valley Crip gang. There is no dispute that defense counsel did not object to the admission of any of this evidence, nor did he request a limiting instruction.

During his closing argument, the prosecution argued that appellant killed Quinn in revenge for Fennell's murder, but did not directly reference any gang affiliation or membership. In contrast, defense counsel's closing argument laid out the defense theory that Quinn's murder was planned and carried out by Sellers as revenge for Fennell's death. The defense argued that Sellers, "as a gang member or as a gang associate, she probably has a firearm in the car most of the time." He also noted that several of the people who threatened Quinn and Cole were gang members, including Bordenave, concluding, "it is my belief based on the testimony from the detective, as well as the Facebook messages, that [Fennell] and his family are either members

9

or associates of the Rollin 30s Crips, and I think that includes Jawnie Sellers."

**B.** *Legal standards*

To prevail on an appellate claim of ineffective assistance of counsel, a defendant must establish both that counsel's performance was deficient and that he was prejudiced by the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 218.) To establish deficient performance, a defendant must show that counsel's representation was objectively unreasonable "under prevailing professional norms." (*Strickland, supra*, 466 U.S. at p. 688.) To establish prejudice, a defendant must show there is "a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694; see also *People v. Goldman* (2014) 225 Cal.App.4th 950, 957.) Unless the defendant establishes otherwise, we presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

If the record "'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.]" (*People v. Ledesma, supra*, 39 Cal.4th at pp. 745-746; see also *People v. Grimes* (2016) 1 Cal.5th 698, 735.)

**C.** *Analysis*

Appellant contends that his counsel should have requested the court give CALCRIM No. 1403, which instructs the jury that it may consider evidence of gang membership and activity only for the limited purposes of motive to commit the crime charged and evaluating credibility. Because this instruction was not given, appellant contends the jury was allowed to improperly consider evidence of his gang affiliation as evidence of his character and propensity under Evidence Code section 1101, subdivision (b).

As such, he asserts that his counsel was ineffective for failing to request this limiting instruction.

The record is silent as to defense counsel's reasons for not requesting a limiting instruction as to gang evidence. Thus, appellant must establish that there could be no satisfactory explanation for this failure. He cannot make this showing. The record demonstrates defense counsel's strategy to establish Sellers's strong ties to the Rollin 30s gang in support of the argument that Sellers was the killer and was motivated by revenge on behalf of the gang. Counsel could have reasonably concluded that a limiting instruction on gang evidence would undercut this defense. Alternatively, given that the gang testimony was relevant to establish motive for the shooting, counsel may have "'tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide.'" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053, quoting *People v. Maury* (2003) 30 Cal.4th 342, 394.) As such, we cannot say that counsel was deficient for failing to request a limiting instruction.

## III. Sentencing

Appellant contends the matter must be remanded for resentencing because the court erred in imposing the high term of 10 years for the firearm use enhancement. Respondent agrees.

At the sentencing hearing, the trial court imposed the high term of 10 years on the firearm use enhancement under section 12022.5, subdivision (a). The court found the fact that appellant was armed with or used a deadly weapon as a factor in aggravation and then concluded that "the circumstances in aggravation outweigh any mitigation in this case."[4] Section 12022.5, subdivision (a) sets forth a low, middle, and high term for personal use of a firearm in commission of a felony. Under section 1170, a trial court may "impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of [the high term] and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury." (§§ 1170, subd. (b)(2); 1170.1, subd. (d).) The underlying

---

[4] Appellant's counsel argued that appellant's youth and his minimal prior criminal record were factors in mitigation.

facts used to prove an enhancement may not also be used to establish the justification for imposing the high term on that enhancement.  (See *People v. Lincoln* (2007) 157 Cal.App.4th 196, 203-204.)

Here, the court relied on appellant's personal use of the firearm as both the underlying factual basis for the enhancement and the factor in aggravation justifying imposition of the high term.  This was error.  We therefore remand the matter for resentencing on the firearm enhancement.

## DISPOSITION

The matter is remanded for resentencing on the firearm enhancement on count one.  The judgment of the trial court is otherwise affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


COLLINS, J.


We concur:



ZUKIN, ACTING P. J.



MORI, J.